**WAIALUA AGR. CO., Ltd. v. MANEJA et al.**
**Civ. No. 787.**

United States District Court
Honolulu D. Hawaii. First D.
May 3, 1951.

Rufus G. Poole, Washington, D. C., Livingston Jenks and Anderson, Wrenn & Jenks, all of Honolulu, T. H., Milton C. Denbo, Washington, D. C., Ernest C. Moore, Jr. and Pratt, Tavares & Cassidy, all of Honolulu, T. H., for plaintiff.

Gladstein, Anderson & Leonard, and Richard Gladstein, all of San Francisco, Cal., for defendant.

METZGER, Chief Judge.

### Part I.

### Statement and Findings.

### I.

#### Nature of Action, Controversy Involved, and Jurisdiction.

This action arises under the Fair Labor Standards Act of 1938, the Act of June 25, 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. Plaintiff sought a declaratory judgment, and the defendants filed a counter-claim under Section 16(b) of the Act to recover unpaid overtime compensation for work performed by them as employees of plaintiff, and to recover liquidated damages, costs and attorneys' fees.

Following an earlier trial herein, a decision and judgment of this court, reported at 77 F.Supp. 480, and an appeal to the United States Court of Appeals for the Ninth Circuit, this action was remanded to this court for further proceedings by a judgment of the Court of Appeals rendered November 10, 1949, reported at 178 F.2d 603.

Following the remand, all pleadings heretofore filed in this action were amended by the parties, so as to drop certain parties defendant from the litigation, to eliminate the representative character of the case, and to limit the action to the period from November 20, 1946, to and including September 14, 1947.

Under the amended pleadings, the following issues arise with respect to that period of time:

A. Were the defendants or any of them exempt from the overtime provisions of the Act by virtue of Sections 13(a)(6), 7(c), or 13(a)(2), during all or any workweeks falling within the aforementioned period?

B. Were certain of the defendants, while performing work of repairing and maintaining plaintiff's dwelling houses, and while furnishing related facilities and services to plaintiff's employees and others occupying such dwelling houses, engaged in commerce or in the production of goods for commerce, within the meaning of Section 3(j) of the Act?

C. What, if any, amounts are any of the defendants entitled to recover from plaintiff pursuant to Sections 7(a) and 16 (b) of the Act?

These issues are raised by (a) the amended complaint of plaintiff and defendants' answer thereto; and (b) defendants' counter-claim, cross-claim, and cross-complaint under Section 16(b) of the Act, and plaintiff's reply and answer thereto. In addition, defendants seek awards of liquidated damages and recovery of costs and attorneys fees, pursuant to Section 16(b). By its reply and answer, plaintiff seeks to defeat the request for liquidated damages, as well as overtime wages due for the period prior to May 14, 1947, by appealing to the good faith defenses contained in Sections 9, 10 and 11 of the Portal-to-Portal Act of 1947, Act of May 14, 1947, Public Law 49, c. 52, 80th Cong., 1st Sess., 61 Stat. 84, 29 U.S. C.A. §§ 251–262.

All issues have been presented and tried in a single trial. The evidence consists of a lengthy stipulation to certain facts, the testimony of plaintiff's office manager, the testimony of 22 of the defendant employees of plaintiff, and certain exhibits received in evidence, to which reference will be made later.

This case does not involve waiting time, clean-up time, travel time, or any of the types of activity whose consideration occasioned in part the passage of the Portal-to-Portal Act of 1947. Defendants have alleged, it is not disputed by plaintiff, and it is found by the court, that the work performed by defendants for plaintiff, for which recovery is sought in the counter-claim, was the principal work performed by them, was compensable both under an express contract and under custom and practice within the establishments and places where the defendants performed such work, and was performed during portions of the days with respect to which the same was so made compensable; that all such work was in fact paid for by plaintiff, but the dispute between the parties is whether the amounts so paid were sufficient to discharge plaintiff's obligations under the Act for overtime compensation.

This court has jurisdiction of this action and of the parties hereto pursuant to (a) Section 24 of the Judicial Code as amended, 28 U.S.C.A. § 1337; (b) Section 274d of the Judicial Code, 28 U.S.C.A. § 2201; and (c) Section 16(b) of the Fair Labor Standards Act of 1938.

Parties and Period of Time Involved.

Plaintiff is a corporation organized under the laws of the Territory of Hawaii on December 14, 1948. This action was instituted on April 9, 1947, by a predecessor corporation to the plaintiff, bearing the same name. On December 14, 1948, plaintiff acquired certain of the assets and business, and assumed certain of the liabilities, of the predecessor corporation, including all rights, interests and liabilities in, or which might arise out of, this action. By stipulation, plaintiff has been substituted as the party plaintiff in this action for the predecessor corporation. All subsequent references to "plaintiff" refer either to the predecessor corporation or to the new corporation substituted herein, depending on whether the matters to which they relate occurred prior or subsequent to December 14, 1948.

Defendants are 42 individuals who were employed by plaintiff during the period from November 20, 1946, to September 14, 1947, inclusive. Each of them appears in this proceeding on his separate behalf only, and in no way as representative of any other persons or legal entities. Unless otherwise specified, each performed his work on the plantation.

## Summary of Plaintiff's Business.

Plaintiff operates a sugar plantation located in the District of Waialua, City and County of Honolulu, Island of Oahu, Territory of Hawaii. In 1945, it was the third largest producer of raw sugar in the Territory. At the present time the plantation grows and produces sugar cane on 9,663 acres of land owned or leased by it. Substantially all of the land now devoted to sugar cane production has been owned or leased by the plantation and used by it for this purpose since 1910.

As of approximately the commencement of the period covered by this litigation, plaintiff had a total of 959 non-supervisory employees.

Plaintiff's business consists of (a) growing, cultivating, and harvesting sugar cane on the lands owned or leased by it; (b) operating a system of railroad transportation over which harvested cane is hauled to plaintiff's mill; (c) processing such cane into raw sugar and molasses at the mill; (d) shipping such raw sugar to a refinery situated in the continental United States, where such raw sugar is refined and subsequently sold under the circumstances later discussed herein; (e) shipping molasses in bulk to the continental United States; (f) operating a series of shops for the purpose of maintaining, repairing and overhauling plaintiff's buildings, machinery, equipment, vehicles, and rolling stock; (g) maintaining mill villages and housing in which plaintiff's employees and their families dwell.

Plaintiff processes no cane except that grown by itself on its plantation. Neither does it directly engage in any sugar refining operation. However, plaintiff and 30 other companies engaged in the production of raw sugar in the Territory, constitute the total membership of an association called California & Hawaiian Sugar Refining Corporation, Ltd. (C & H), a California corporation. C & H is qualified as a cooperative marketing association under the federal Capper-Volstead Act, 7 U.S.C.A. §§ 291, 292, and under the applicable laws of the State of California. During the period involved in this litigation the members of C & H, including plaintiff, were under contract to deliver, and did deliver, to C & H, all of the raw sugar produced by them in the Territory, except for inconsequential amounts sold for consumption as raw sugar in the Territory.

In this same period, C & H operated a sugar refinery at Crockett, California. Under the mentioned contract, C & H was entitled to process all raw sugar delivered to it by its members, and to sell the refined sugar resulting therefrom, as well as to sell in the form of raw sugar any quantities delivered by the members of C & H. Actually, C & H processed into refined sugar more than 90% of the raw sugar delivered to it by its members, selling the balance as raw sugar.

The proceeds received by C & H from its sale both of refined sugar and of raw sugar, as well as any by-products produced by it, were distributed in the following manner. After first deducting the operating expenses of C & H, the remainder was paid over to the members of C & H, including plaintiff, partly in the form of dividends at 6% on the shares of capital stock of C & H, all of which were owned by the aforementioned 31 Hawaii companies—"substantially in the same proportion as the tonnage of raw sugar which they ship to C & H" (Def. Ex. 2)—and the balance was paid over to the same companies, in direct proportion to the amounts of raw sugar delivered by them to C & H.

## Plaintiff's Plantation Operations.

Sugar cane is highly perishable. To avoid serious losses it is processed into sugar, syrup or molasses within a relatively short time after being harvested—usually, as the record shows, the practice of processing is between 4 and 16 hours. It "cannot be stored more than 2 or 3 days without spoiling" (Def. Ex. 3B, p. 36).[1] It does not move into interstate commerce in its natural state. Except for small amounts which are used as seed cane, it is grown for

1. For this reason and because of the great weight and bulkiness of cane as compared with raw sugar, it must be processed within a few miles of where it is grown.

the purpose of producing sugar, syrup and molasses. It is these products, which result from the processing of cane, that become articles of interstate commerce.

Substantially all of the cane-growing land of plantation, its buildings and yard area, and other lands owned or leased by it, but unsuited for cane growing, including a wooded area from which firewood is cut for use for fuel by plantation employees living in the plantation villages, forms a contiguous and compact area. All lands devoted to the growing of cane are managed and operated by plaintiff as an integrated farming unit and single enterprise with identical cropping cultivation and harvesting practices, and with the same labor and equipment.

The growing and harvesting of cane, its processing in the mill, and the shipping of raw sugar to the refiner, take place continuously for a period of approximately 7–9 months. Annually, the harvesting and processing of cane are wholly suspended for the remaining 3–5 months, for the purpose of completely reconditioning the mill and equipment, and installing machinery and improvements.

Plaintiff's buildings, including the mill where cane is processed into raw sugar, and a number of buildings which house repair shops for the maintenance of field, transportation and mill equipment, warehouses for plantation supplies, and other buildings having functional relation to the entire plantation operations, are centrally located in the lowlands of the plantation in a compact area.

Plaintiff's cane field operations are highly mechanized. Since 1910 there has been a gradual reduction in the number of man days required to produce a ton of raw sugar on plaintiff's plantation. This reduction was brought about through mechanization and the application of scientific methods. To a large extent hand labor and the use of horse-drawn equipment and vehicles have been eliminated, and motorized equipment substituted in their stead.

The transportation system of plaintiff is also highly mechanized, and this is likewise true of the processing operations in the mill.

There is a high degree of coordination between field operations, transportation, mill processing, shipping, and all other aspects of plaintiff's activities. "Operational problems on a sugar plantation are comparable to those of a Detroit factory rather than to those of a large Iowa farm. The primary objective of the management is to maintain 'belt-line production' of sugar by so scheduling the various field throughout the plantation for harvesting and transport to the mill that full-scale raw-sugar production will be continuous, 24 hours a day. To do this it is necessary to maintain a fleet of large trucks, mechanical harvesting equipment, a system of narrow-gage railways (or other means of transporting cane to the mill), a laboratory for scientific observation to determine the water and fertilizer needs with an organized force of workers to implement these findings, and large pumping stations and gravity systems for controlling irrigation." (Def. Ex. 3B, p. 36.)

During the year 1945, plaintiff's direct operating expenses amounted to one and three-quarter million dollars. Of this sum, manufacturing costs approximated five hundred thousand dollars, and an additional sum of approximately two hundred thousand dollars was expended on transportation, in major part for main line hauling of cane into the mill. The record does not disclose the amount expended for operation of the repair and service shops, or for maintenance of employee housing and village facilities.

It appears that plaintiff's railroad system was valued at more than three-quarters of a million dollars (Def. Ex. 2).

### Activities Occurring From the Time Cane Fields are Prepared For Planting up to the Time of Harvesting.

In the preparation and plowing of its cane fields, a so-called "stone boat" sled is used to clear the fields of stones, rocks, and similar obstructions. Concrete irrigation flumes and pipes are moved to their proper location. Sugar cane seed is then planted. The fields are then "ratooned", this being an operation performed after a cane field is harvested to prepare it for the

growing of another crop. In the cultivation, herbicides and insecticides are applied, by means of spraying equipment; in the fields, along irrigation ditches and flume areas, and along cane field roads. Weeds are removed, fertilizer is applied to the fields, and water is supplied by a net-work of irrigation ditches, canals, siphons, concrete pipes, flumes, water storage reservoirs and pumps, all of which plaintiff owns, operates and maintains. Ultimately the cane is harvested, loaded into cane cars on portable tracks in the fields, and then moved to the main line railroad.

Throughout the plantation, plaintiff maintains a network of field roads for the transportation of labor, field supplies and equipment.

Intensive irrigation throughout the year is required for the acreage devoted to cane production. Irrigation frequency is guided by soil moisture samples collected weekly from each field. Approximately 97–98% of the water received by plaintiff is utilized for irrigation of its cane fields. The degree to which water is used by plaintiff for irrigation purposes is shown by a tabulation received in evidence. In the year 1940, for example, plaintiff applied 30,548 million gallons; this was a daily average of 84 million gallons. By way of comparison, the city of San Francisco used 65 million gallons daily in the same year (Def. Ex. 3B, p. 43).

Plaintiff also uses substantial quantities of water to supply its mill, to operate locomotives used on plaintiff's railroad, for the domestic water needs of plantation villages and plaintiff's employees living therein, for sale to small farmers whose produce is consumed locally, and for plaintiff's system of fire protection. The amount so consumed averaged two million gallons daily.

### Harvesting Operations.

To insure a balanced flow of cane to the mill, harvesting operations are coordinated with the needs and capacity of the mill, and the potential of its transportation system.

Fields ready for harvesting are first burned over, to increase efficiency in removing the cane and to reduce trash carried to the mill. In preparation for burning, fire brakes are cut through the cane by a tractor bulldozer rake. This tears cane stalks from the stools and pushes cane off to the side.

After the cane is burned, the bulldozer rake opens up lines for the laying of portable track. A portable track plow or leveler follows through these lines to make proper beds for the track. Portable track rail cars, loaded with sections of track, are drawn into the cane fields by tractors. Lifting machines hoist the track sections from the loaded cars and lay them on the track beds. Empty cane cars are then hauled from the main line of plaintiff's railroad onto a siding thereof into the field for loading purposes, and are placed into position for loading. Cane is loaded on the cars by machines, which are cranes equipped with a boom and a finger-like grab; these pull or grab the cane loose from its growing position and load it directly into the cars. Plaintiff owns 9 such caneloading machines. Full cars are hauled out of the field to the main line for transportation to the mill. A carload of cane averages slightly less than 5 tons per car, gross cane.

Cane pieces along the portable track are later picked up by a ground crew and thrown into cars drawn by tractors. Full carts are dumped near the cane loading machines for subsequent lifting into cane cars. Cane dropped in the fields is bulldozed into piles, and these are later lifted by machine into the cars. This operation is referred to as "brooming cane". Where the main line railroad passes adjacent to the cane field, harvested cane is loaded directly into cars spotted on the main line tracks.

### Main Line Transportation.

From the time of its organization plaintiff has owned and operated a narrow-gage railroad system. This system is constructed, located and operated exclusively on the plantation. It hauls no cane or freight for anyone other than the plantation. It is used predominantly to haul sugar cane from points where cane cars have been concentrated to the mill. It is also used to haul portable rails and other supplies and equipment from the plantation's warehouses

and shop yards to and from the fields, but most of this type of hauling is handled by the plantation trucks. The plantation has a spur track approximately three thousand feet in length running from its mill and warehouses, and connecting with the railroad line of the Oahu Railway & Land Company. This spur track was used by the plantation to deliver box and tank cars loaded with sugar and molasses to the O. R. & L. Company, and to receive incoming supplies delivered to the plantation by the O. R. & L. Company. The O. R. & L. Company discontinued its operations at the end of 1947. Since that time the outgoing and incoming freight of the plaintiff has been handled by an independently owned and operated trucking company.

The plaintiff's railroad network consists of 56 miles of permanent main line track, hereinafter frequently referred to as "plaintiff's main line railroad", and slightly more than 9 miles of portable track.[2]

The plantation railroad equipment consits of six 25-ton steam locomotives, one 17-ton steam locomotive, one 12-ton steam locomotive, one 12-ton gasoline locomotive, and one 14-ton diesel locomotive, 200 steel cane cars measuring approximately 11 feet by 6 feet by 5 feet, and 512 wooden cane cars measuring approximately 10 feet by 6 feet by 5 feet.

For the functioning of this railroad system, plaintiff maintains a roundhouse, employs section men to maintain the main line trackage, employs 10 crossing watchmen to protect the public at government road crossings, employs workers to spray the railroad rights-of-way with a herbicide, employs workers who together with field men pick up cane spilled along the railroad rights-of-way, and employs personnel to operate the trains. Six to nine train crews, with an average of seven, are required daily to handle cane and incoming and outgoing freight. A train crew consists of four men, including a locomotive engineer, a fireman, a front brakeman and a rear brakeman. A cane train averages at least 60 cars, though this number sometimes goes up to 80 or even 90 cars.

Working in the roundhouse are a hostler and an engine wiper, who wash the locomotives and steam boilers, oil and grease the locomotives, fire and steam the locomotives preparatory to the day's operations, and assist in minor repairs to locomotives.

During the off-season, when cane is neither being harvested nor processed, the section men, supplemented by approximately 12 brakemen and 5 firemen, are used in repair and maintenance of main line trackage. Watchmen are used for cleaning and weeding the rights-of-way. Usually one locomotive engineer, two firemen, and three brakemen are assigned to assist the electricians on mill work primarily. One fireman and two brakemen are generally assigned to the welding shop to assist in off-season factory repairs and installation of new equipment. Two more brakemen are sometimes assigned to repair work in the boiling house. One yard engine crew, consisting of an engineer and several brakemen for the diesel locomotive, is maintained during the off-season. Locomotive engineers not otherwise used assist in locomotive repairs.

### Mill Operations.

At its mill, plaintiff processes cane into raw sugar and molasses. Raw sugar is there bagged for shipment to the C & H refinery at Crockett, California. Molasses is either loaded for shipment to the continental United States, or stored temporarily in molasses tanks. Bagged sugar and molasses were loaded into railroad box and tank cars of the Oahu Railroad & Land Company, a carrier, which then proceeded with the transportation of these commodities to points of shipment for the mainland.

2. Portable track laid in the field for harvesting operations lacks proper roadbed for the locomotives. The primary reason for the use of the portable track for harvesting is that permanent track cannot be laid in the field because of interference which would otherwise result in planting and cultivating operations. During the short periods when such track in the fields is in use it is an integral part of the railroad system over which cane cars move directly from the fields to the mill.

The term "mill" means the building and equipment of plaintiff used in the actual processing of sugar cane into raw sugar. This includes a cane-cleaning plant and scales, mill carrier, crushing plant, boiling house, fire-room, power plant, sugar warehouse, molasses tank, and all equipment located therein.

Mill operations commence when loaded cane cars are delivered by locomotive on the plaintiff's main railroad, to the mill yard and moved up to the mill. Here the cane is weighed, unloaded, washed, and as much trash is removed as is mechanically possible. These operations take place in the cane-cleaning plant.

After being cleaned, the cane is moved by mill carrier to the crushing plant, is there crushed, and the juices extracted. Sugar juices are then clarified and crystallized in the boiling house. The chief product, which is raw sugar, is then bagged and shipped, or temporarily stored and later shipped.[3] Molasses is pumped into a storage tank at the mill, and later shipped.

The cane fiber which remains after the extraction of the juice from the cane stalk is known as bagasse. It serves as an economical source of fuel for the production of power. Bagasse produced at this plantation has no marketable value, but is burned in the fire-room, located in the mill, and produces steam. This in turn is used to drive the mill engines and cane processing equipment, to heat and evaporate sugar juice and crystallize the raw sugar, and to generate electric power at the mill's power plant. Steam used for the latter purpose, after passing through generating machinery, is conveyed through lines for further use in processing operations.

The power plant generates electric power. This, however, supplies only about two-thirds of the power needed by plaintiff, so it purchases one-third of the power used by it from the Hawaiian Electric Company, Ltd., an independently owned and operated public utility.

There are times when plaintiff's power system generates more power than it has need of. Because of an existing tie-in between its power system and that of Hawaiian Electric Company, on rare occasions plaintiff feeds back power into the system of Hawaiian Electric. Credit for such power is given to plaintiff in the same manner as though a sale had occurred.[4]

Power generated by plaintiff, as well as that purchased by it, is distributed by transmission lines to all the various operations on the plantation, and also to several non-plantation users living in the plantation community. The total amount of power used by non-plantation users is about one-half of one per cent of all the power distributed by plaintiff. None of it is used for or in connection with the production of goods for commerce, or to operate any instrumentalities of interstate commerce, or transmitted into interstate commerce.

In the off-season, when the steam and electric power equipment in the mill are overhauled, plaintiff generates no electric power, purchasing all the power it needs from the Hawaiian Electric Company.

Weekend Shutdown in the Mill.

Production in the mill operations is keyed basically to a 6 day week with continuous and around-the-clock operations divided into three 8-hour shifts. The mill stops grinding cane at 2 p. m. Saturday and starts up at the same time on Sunday. The cessation of grinding operations on Saturday does not, however, result in the stopping of all mill operations. As shown later, in the descriptions of work performed by various defendants, the weekend shutdown period does not extend for 24 hours in regard to the boiling house, the fireroom, and the operations of the power plant.

---

3. The plaintiff's temporary storage of raw sugar is never motivated by economic considerations, but is due only to the limited number of cars and limited storage space at the port wharves and occasional interruptions in ship schedules.

4. Power is not fed back to the Hawaiian Electric lines for the purpose of selling power but only because it is a necessary, convenient and economical method of disposing of the excess power.

The weekly shutdown for mill operations is necessary to perform cleaning and minor repair work.

### Off-Season.

Although sugar cane can be and is grown the year round in the Territory of Hawaii, efficiency of operations dictates the closing down annually of sugar mills so that extensive general repairs, reconditioning, and installation of improvements can be had. That part of the year when the mill is shut down for repairs is termed the "off-season". While the off-season usually lasts 3-5 months, in the period covered by this litigation it extended only from December 22, 1946, to and including February 9, 1947.

During the off-season, plaintiff conducts no harvesting, cane transportation, or cane processing operations. Field operations continue.

Most of the off-season repair work in the mill is done by employees who, during the grinding season, operate the mill machinery. However, some of this repair work is done by employees of the machine shop, welding shop, blacksmith shop, carpenter shop, and electric shop.

Just as many man-days of work are performed during each 24-hour period in the mill during the off-season as during the grinding season.

### Repair and Service Shops.

Both field and mill operations necessitate the equipping and maintaining of complete service shops for prompt minor repairs and emergency work and major overhaul.

Plaintiff operates and maintains a number of repair and service shops which are physically distinct from the mill, housed in separate buildings, and located in an area extending up to 300 feet from the mill building. These shops employ upwards of 100 men, plus necessary foremen and supervisors. These shops are: machine shop, welding shop, blacksmith shop, tinsmith shop, caneloading machine repair shop, tractor repair shop, garage, electric shop, carpenter shop, paint shop, plumbing shop, and roundhouse.

### 1. *Machine Shop.*

The machine shop is staffed by 8 employees working under supervision of a machine shop foreman. Practically all of plaintiff's machining work, except heavy work required by the mill, railroad and shops, is done in the machine shop. The grinding of crankshafts for cars, trucks, tractors, and cranes, the machining of emergency parts for such equipment, and machine work on irrigation pumps are performed in this shop. Major locomotive repairs are made by machine shop personnel working with a heavy crane in the welding shop.

Approximately 46% of all machine shop work is for the mill, and 50% for other service departments, including repairs to steam engine driven irrigation pumps. During the off-season, mill work done by the machine shop accounts for from 85% to 90% of the total man hours' work performed.

Work in the machine shop is fairly uniform throughout the year, with peaks in cases of emergency mill repairs and during the mill off-season. Locomotive overhaul is carried out to a limited extent during the grinding season to relieve machine shop off-season work. Steam engine driven water pumps are scheduled for overhaul after the mill overhaul has been completed and after grinding operations are resumed.

A large portion of the work done by the machine shop personnel is performed within the shop, utilizing shop tools. These tools include lathes, hydraulic press, drill press, planer, boring machine and crankshaft grinder. From time to time machine shop personnel are called into the mill to perform repairs, regrooving of mill rolls, and such other work as cannot be expeditiously handled by mill workers.

### 2. *Welding Shop.*

This shop employs 5 men under supervision of a welding shop foreman. About 46% of its work is for the mill. In the off-season, welding shop work for the mill represents approximately 90% or more of the total man-hours. Most of the welding repairs to mill equipment are made in the shop, although personnel are sometimes dispatched to the point of breakdown.

Steel cane car repairs are made alongside the shop building by the shop personnel. Welding shop employees also operate pipe rolls located in the pipe rolling shed. The pipe which is rolled is generally irrigation pipe 18 inches in diameter or larger. Welding of this pipe is performed by the shop welders. In this work the welding shop employees are assisted by employees from the blacksmith shop or caneloading machine repair shop.

Welding shop equipment consists of heavy pipe rolls, several sets of acetylene and cutting outfits, acetylene generators, and both stationary and portable welding generators.

### 3. *Blacksmith Shop.*

This shop employs 2 blacksmiths and 2 helpers under supervision of the caneloading machine repair shop foreman. About two days each week are spent by the blacksmiths and helpers on mill work, consisting principally of constructing and reconditioning of cane carrier leveling and preparation knives. Cane car repair work, such as straightening of bars and channels, and repair of tractors and caneloaders, and field implement work, occupy the great percentage of the man-hours in the shop. The work of this shop is uniform throughout the year. Equipment in this shop includes 2 forges, an electrically operated hammer, and a variety of small tools.

### 4. *Tinsmith Shop.*

This shop employs a tinsmith journeyman and 2 helpers. Mill repair work here is negligible, although light sheet steel work, including maintenance and repair of roof gutters and down pipes, is performed by the shop personnel. Repairs of auto, truck, tractor and caneloader radiators are performed by the shop personnel.

The main work of this shop is the making and reconditioning of tin irrigation scoops. These scoops are used in quantity in the field for the purpose of deflecting water from concrete irrigation flumes to field irrigation lines.

### 5. *Caneloading Machine Repair Shop.*

Twelve employees and a foreman work here. They perform all major repairs and overhaul of caneloaders, grabs and miscellaneous field equipment. Men from this shop are occasionally called upon to assist in emergency mill repairs. They also go into the field to repair caneloading machines during the course of harvesting operations.

An important function of this shop is the construction of auxiliary field equipment, such as sub-soilers used in plowing, cane line reshapers used to maintain irrigation water lines in the field, and portable track line leveler attachments used in leveling the lines for laying portable tracks. Repairs on such auxiliary field equipment are also made in this shop, with assistance from personnel of the tractor repair shop.

In the off-season, at least 8 of the 9 caneloading machines are completely dismantled and reconditioned. The 9th machine is reconditioned after harvesting has been resumed. In the off-season, 10 to 12 operators of caneloading machines are brought in to supplement the regular employees of this shop, and to assist in overhaul. Five cane grabs are overhauled and reconditioned during the off-season, and all other cane grabs are repaired. During the harvesting season, 3 new cane grabs are usually built.

Equipment in this shop includes 4 portable welding generators, and 3 portable welding generators mounted on trucks for field repairs. A hydraulic press, overhead crane, motor-driven grinders and a variety of small tools complete the shop equipment. Four welders in the shop take care of welding repairs in the field, and repairs to, and building of, new field equipment.

### 6. *Tractor Repair Shop.*

Seven employees normally work here, but in the off-season this number is supplemented by 12 to 15 tractor operators who are brought into the shop from the fields, to assist in repairs. All tractors used in the harvesting field are overhauled in this shop during the off-season. Tractors used for towing cane line reshapers are also overhauled during the off-season. Other tractors which cannot be overhauled during the off-season are scheduled for overhaul at a later date. This may mean that 6 or 7 out of a total of 48 tractors are left for oper-

ating season overhaul. Tractor engines are overhauled at regular periods.

Employees of this shop are sometimes dispatched for repair of tractors in the fields. They also assist in repair of field implements in the caneloading machine repair shop.

### 7. Garage.

Personnel employed here numbers 24. Primarily work of the garage is to maintain and keep in repair plaintiff's 98 motor vehicles, consisting of 18 passenger vehicles, 48 pick-up trucks up to one ton, 27 heavy trucks from 1–½ to 7 tons, 1 motorcycle, 2 fire trucks, and 2 panel trucks. Sixty-four of these vehicles are assigned to operations in the fields, 12 to the repair and service shops, 1 to the mill, 1 to the hospital, 2 to the plaintiff's retail store, 7 for administration, 2 are fire trucks, and 9 to the motor pool.

Overhaul of cars and trucks is scheduled throughout the year, except that pick-up trucks used by the harvesting men are overhauled during the off-season. Truck drivers are not used to assist in truck or auto repairs, since there is generally a spare truck to drive when others are being repaired. All such work is performed by the garage mechanics.

Shop equipment consists of 4 overhead cranes, a hoist, valve grinding machine, brake drum lathe, boring machine, tire tools, and a variety of special tools.

Complete servicing equipment is also maintained, together with necessary personnel. Seven full-time employees and one part-time employee perform the lubricating and washing of vehicles. One employee dispenses gas and oil at the yard service station. Six persons are employed as helpers to garage mechanics when there is no service work.

Field service covers the daily lubrication of all equipment and the replenishing of fuel tanks. Tractors, cane-loading machines, portable air compressor, diesel and gasoline locomotives, and all field equipment are serviced daily by a total of 6 men. Two completely equipped service trucks manned by 2 men each service all field equipment, except that in the harvesting fields. In the latter case, a two-wheel trailer, tractor-drawn, is kept in each of the two harvesting fields. Oil, gasoline, diesel oil, greases and water are carried on the trailer together with power-operated grease guns. One man assigned to each trailer services the cranes and tractors in the harvesting fields. In this way service work can be done during lunch hour and slack periods without serious interference with harvesting operations.

### 8. Electric Shop.

Fifteen employees work in this shop. Three of these are mill electricians who divide their time between the mill and the shop, working two weeks in the former, then one week in the latter. The shop maintains electric pumps and transmission lines and performs domestic wiring repairs, including wiring of houses, and the building of new electrical appliances. Employees of this shop perform necessary work on electrical machines located in the other shops.

In addition to mill repair work done by the employees assigned as electricians to the mill, electric shop personnel may assist them in case of major electrical repairs required. About half of the work in this shop is for the mill. During the off-season, about 70% of the work is for the mill.

### 9. Carpenter Shop.

Twenty-five carpenters and two supervisors comprise this shop's personnel. They perform all carpenter work on the plantation, which includes construction of mill scaffoldings, construction and maintenance of railroad trestles and wooden gates for flumes, and construction and maintenance of cane cars. In addition, they perform necessary maintenance work on the plantation buildings and houses. They also install and maintain steel and concrete pipe lines and siphons. Miscellaneous construction, such as construction of tool lockers, scrapers and strainers, is performed in this shop. Field work, including work on the flumes, railroad trestles, siphons and pipe lines, accounts

for about 25% of the work of the employees. Mill scaffoldings and mill building repairs, construction of tool lockers, scrapers and strainers, account for another 10%. Maintenance and repair of plaintiff's buildings and housing account for another 45%. The remaining 20% of the work consists of construction and repair of cane cars. The work is uniform throughout the year, with little change between grinding season and off-season. During the off-season, additional men averaging from 10 to 15 may be brought in from the fields to assist in cane car overhauling and general carpentry work.

### 10. Paint Shop.

Here are employed 5 painters and a supervisor. They perform all painting work on plaintiff's buildings, including housing, and they also occasionally paint siphons and railroad trestles. As a general rule, they do not paint for the mill, this work being done by mill employees. Most of the time of the paint shop crew is devoted to painting of plantation buildings and housing throughout the year. During the off-season, an average of two additional employees brought in from the fields may assist in the work of this shop.

### 11. Plumbing Shop.

Six plumbers and one supervisor work here. They perform all plumbing work on the plantation, including the construction and maintenance of sewer and water systems and plumbing for buildings and housing. Approximately 10% of the time is devoted to mill plumbing work, 15% to field work and the remainder to buildings and housing. Assignments vary little throughout the year. During the off-season, an average of two field employees may be assigned to the plumbing shop as helpers.

### 12. Roundhouse.

Reference to the roundhouse has already been made. It regularly employs two men in the shop, who perform the servicing, cleaning and firing of plaintiff's locomotives. Additional employees are occasionally assigned to this shop to assist in minor locomotive repairs.

### Laboratory.

In a separate building, plaintiff operates a laboratory. Various chemical tests are made by the laboratory personnel in the course of all field and mill operations. This work is performed under the supervision of a chief chemist with the assistance of 13 chemists, testers and samplers. By performing careful analysis of various kinds relative to the cane and materials in the course of growing, cultivating and harvesting of cane, and the extraction of the sugar juices, all operations are controlled pursuant to scientific methods.

Determinations of the cane fiber in each field, or variety of cane, are made during each shift. Figures obtained are used in calculating bagasse weights, field distribution and extraction percentages.

Cane leaf analysis is made from samples of cane tops brought in each day and analyzed for green weight mixture, total sugars, nitrogen, potash and phosphate.

Daily tests are made for a variety of other purposes. Tests are made to determine the amount of field trash in harvesting brought to the mill. Continuous samples are taken from the feed roller of the first mill each hour, and also at each change of harvesting, and records of ratios of cane to available sugar are obtained. Extracted juices are sampled to determine the sugar obtained from cane by the milling process. Extracted juices are used to calculate the weight of bagasse. Every three hours samples from clarified juice are taken, to reveal the relative amount of solids being removed by the lime and heat treatment of juices. Purity of syrup is checked. Samples of bagasse are taken every two hours, and ash determinations are also made twice daily, to determine the influence of different fields on the fireroom. Mixtures of sugar and molasses are tested to determine the amount of sugar lost in the filter cake.

Tests are also made of the mill boiler water, locomotive boiler water, steam pump boiler water, and pump water. Pump water

from electric pumps and well water are sampled once each month. Wash water from the cleaning plant and condenser water are also analyzed each shift.

## Concrete Products Plant.

In a separate building, plaintiff operates its own concrete products plant. Six men ordinarily staff it, although the number varies from 4 to 10. Work is usually performed on a single shift basis, but occasionally two shifts are maintained.

This plant is engaged primarily in producing concrete irrigation flumes and water supply pipe. It also makes blocks, footings, sidewalk slabs and various other incidental concrete products required by the plantation. Crushed rock used in the manufacturing process is purchased locally, but from 80% to 90% of all cement used is obtained from the continental United States. The work consists of setting up forms, mixing and pouring concrete, removing the previous day's products and arranging them in storage. Cement used is stored in cars which are set on the siding near the plant, or the cement is stored in the cement shed as part of the inventory of general supplies warehousing. In the latter case, unloading of cement is done by the warehouse personnel. Various activities requiring the flumes, pipe and other products receive them direct from the storage area where the products are stored.

The operations do not have any off-season. During the off-season, however, additional personnel may be brought in from the fields. In 1946, the plant produced approximately 46,000 concrete pieces, including flume sections, pipe and other products.

## Storage of Supplies.

Materials and supplies purchased for plantation operations are warehoused or stored in several separate buildings located in the plantation buildings and yard area. Value of supplies on hand averages $500,000. The total value of goods procured during a year, including stock and special order materials, averages over $1,000,000.

Most of the materials received were shipped to the plantation from Honolulu on the O. R. & L. Purchases may be either local or by order and direct shipment from continental United States. Freight received is placed in the proper warehouses by the warehousing personnel. In almost all cases railroad sidings permitted placement of the O. R. & L. cars next to the warehouse receiving the materials. The warehousing personnel is not responsible for, nor does it engage in, delivering materials to the various operations or shops.

The principal buildings in which the supplies and materials of the plantation are stored are the general supplies warehouse and the heavy supplies warehouse. They house electrical goods, building hardware, paints, window screening, tractor and caneloading repair parts, copper tubing, pipe stock, metal shapes stock, galvanized sheeting, steel sheets and many other items.

The oil storage warehouse contains lubricants and a limited amount of paint.

Gasoline, fuel oil, diesel oil and kerosene were discharged directly from the O. R. & L. tank cars into storage tanks.

Most of the automotive parts and tractor, caneloading and miscellaneous parts are stored in the garage.

Cement is stored in a separate warehouse. Lime is stored in the mill in the lime room after being unloaded by warehousemen.

Lumber is stored in the open lumber yard adjoining the general supplies warehouse. Herbicides are also stored there.

Fertilizers are usually trucked directly from railroad cars to the field as needed; but if temporary storage is required, they are placed in the sugar warehouse.

The warehousing operations are handled as one unit under a warehouse superintendent with 13 employees. Five clerks perform the bookkeeping and handle accounts. The remainder of the warehouse personnel is employed in the unloading and storing of stocks and materials, keeping stock record cards and taking inventory.

## Main Administration Office.

The main administration office is located about 1500 feet from plaintiff's buildings and yard area. The manager, assistant manager, and staff assistants have their offices here. Employees include the cashier, bookkeeper, head timekeeper, 6 assistant timekeepers, 8 clerks, 5 stenographers and typists—a total of 22 employees working under the office manager and his assistant. Four timekeepers keep the time of the field employees; 2 keep the time of the shop, store, mill, hospital and village maintenance employees. These offices are where payroll records are maintained, and salaries and services paid.

Also housed in this building are the offices of the civil engineer, one assistant surveyor, 2 junior surveyors, and 2 rodmen, who work alternately in the field and in the office. There is also a draftsman employed in this office. The agriculturist and industrial relations sections are also located in the same building.

## Stables.

The plantation has one main stable near the plantation buildings and yard area. It uses 38 horses and mules. Horses are used by the harvesting overseer to ride in the fields. Pack mules are used upon occasion to pack seed, fertilizer, broken concrete flumes and other things in and out of the cane fields. The plantation has several feeding stations for horses and mules where they are kept temporarily while work is being performed in a particular area. Three employees are assigned to the work of the stables.

## Firewood.

Plaintiff maintains a splitting station in the mill yard. This is equipped with saw and splitting machinery generated by electric power. Firewood, cut by plaintiff's employees at various places on the plantation, is brought to the station to be sawed and split into pieces of appropriate sizes. The uses of such firewood are: sale of firewood to employees and pensioners, for cooking and heating purposes; for heating water at the village bathhouses; and for starting small boilers and heating walls within the furnaces and pumps used to supply water for irrigating cane fields and for domestic and other uses in plantation villages.

## Macadamia Nut Trees.

Macadamia nut groves are operated by plaintiff in an area approximating 121 acres. Such area is not suitable for sugar cane. During the period covered by this litigation, the trees had not yet reached maturity and no nuts were harvested. A nursery for cultivation of young macadamia trees is maintained on the plantation.

## Plantation Villages.

At the time plaintiff was originally organized, there was no established community housing, or other facilities, in or near the area which plaintiff proposed to devote to the production and processing of cane. To establish a stable labor supply and house it at places convenient to plaintiff's purpose, plaintiff undertook to create a community, and to supply housing and other necessary services and facilities for its employees. Plaintiff constructed houses, developed services, and built up and established various facilities to serve the needs of permanent living, in plantation villages, of its required number of employees and their families. This was done over a period of years, resulting in the development of Waialua village and several small villages.

Waialua village has all the physical and visual characteristics of an established community and is similar to a typical small town of a farming community center. The area is crisscrossed with government roads and roads constructed and maintained by plaintiff. The community offers the usual services and typical commercial establishments to be found in any small town. There is a company store, or retail store, with two branches; an automotive service station; and a hospital. These are owned and operated by plaintiff for plantation employees and their families and non-plantation persons. Plaintiff also built in this area two gymnasiums, one clubhouse, one athletic field, one beachhouse, one swimming pool, and two tennis courts, which are available to an athletic association, mem-

bership of which is composed both of plaintiff's employees and others in the community.

Additional services and establishments located in the community, which are independently operated, include ten general stores, two restaurants, two fish markets, one candy store, one hardware store, one clothing store, four barber shops, one beauty shop, one photographic studio, two automotive service stations, two motion picture theaters, and one bank. "It must be remembered that the whole plantation area, including the town, is owned by the plantation company, and although there are frequently many shops, such as drug stores, tailor shops, shoemaker shops and the like, that are privately operated, they rent their sites from the plantation and can remain only as long as the plantation permits them to do so. Anyone on any part of the plantation is a trespasser unless he has the permission of the management to be there. * * *" (Def.Ex. 3A, p. 71.)

Also located in the village are a post office, public library, five churches, one intermediate school, one high school, and one day-care center operated by the territorial school system.

For many years, plaintiff's employees occupied plaintiff's dwellings pursuant to a system of perquisites. Under this system, employees received housing, housing maintenance, water, firewood and kerosene fuel, electricity, medical care, recreational facilities and various maintenance services, including garbage disposal and street cleaning, as a part of their regular compensation as employees of plaintiff. This system was abolished by an agreement dated November 19, 1946, between plaintiff and the International Longshoremen's and Warehousemen's Union, Local No. 145-7, which acted as collective bargaining representative for most of plaintiff's non-supervisory employees. As part of the change thus inaugurated, the value of the perquisites previously allowed to employees was converted, at scheduled rates, into cash wages to be paid by plaintiff by way of wage increase, and thenceforth the employees commenced to pay cash, at scheduled rates, as

non-employees do, for the continued furnishing by plaintiff of the aforementioned facilities and services, except that no charge, either to employees or others, was designated for garbage collection, sewage disposal, fire protection, maintenance and cleaning of village roads and similar village services, which continued to be provided by plaintiff. Neither was any charge designated for continued use of parks, playgrounds, plaintiff's clubhouse and gymnasium and recreational facilities generally.

An undisclosed number of plaintiff's dwelling houses are not equipped with tub or shower facilities. For the inhabitants thereof, plaintiff maintains bathhouses. From November 20, 1946, when perquisites were terminated, until April 30, 1947, no charge was made for use of the bathhouse, except as this was included in the rent paid by employees for the dwelling houses. Commencing May 1, 1947, and throughout the balance of the period covered by this litigation, plaintiff instituted a system of charges for use of the bathhouses: 50¢ per family per month, and 25¢ per month in the case of a single man without dependents.

At the present time, the dwelling houses owned by plaintiff number 820, all located on the plantation. Most of them surround the buildings and yard area located near the mill. These houses, together with the business establishments of the community, constitute the village of Waialua. There are 335 houses which are scattered over the plantation, but these too are located in clusters and form small villages.

No employee covered by the existing collective bargaining agreement, including each employee defendant herein, is required as a condition of employment to live on the plantation or in plantation houses or to use any service or facility that the plantation may be in a position to render its employees. The relationship that exists between the plantation and its employees who live in plantation houses is that of landlord and tenant. However, of the total number of 959 non-supervisory employees of plaintiff, only 16 live off the plantation in houses not supplied or owned by plaintiff. The remaining employees and

pensioners, together with their families, an aggregate of 2952 persons, all inhabit dwellings owned by plaintiff and generally located in Waialua village, or one of the other plantation villages owned by plaintiff. Plaintiff also rents to non-employees, totaling 421, dwellings not occupied by employees of plaintiff. Some of these persons work off the plantation altogether; others are persons who own, operate or are employed in the independently controlled businesses located in plaintiff's plantation villages.

The relationship between an individual's employment with plaintiff, and his occupation of a company-owned house, is shown, as testified to by 22 of the defendants, in the following tabulation:

| Defendant | How long employed by plaintiff | How long has lived in house owned by plaintiff |
|---|---|---|
| Claunan | 20 years | 20 years |
| Crisostomo | 26 years | 26 years |
| Cumlat | Over 10 years | 20 years |
| Faria | 40 years | 44 years; bought own home in June, 1950 |
| Fujiwara | 12 years | Lives with her family, which has occupied company-owned house for over 30 years |
| Hayashi | Over 15 years | 25 years |
| Holmberg | 23 years | (Not testified to) |
| Izawa | 22 years | 36 years |
| Kobota | 23 years | 23 years |
| Koshiwabara | 26 years | 26 years |
| Lorenzo | 14 years | 14 years |
| Maneja | 23 years | 23 years |
| Mori | 16 years | 34 years |
| Oato | 14 years | 30 years |
| Pacheco | 7½ years | 27 years |
| Reyher | 25 years | 29 years |
| Robello (S) | 28 years | 45 years |
| Sunihara | 20 years | 26 years |
| Takata | 20 years | 39 years |
| Tanaka | 11 years | All his life; was born in company-owned house |
| Watanabe | 17 years | 5 years |
| Yamada | 24 years | All his life; was born in company-owned house; father was employee of plaintiff. |

Plaintiff has established a fire protection system at the village of Waialua, and as part of that system operates two fire trucks. It also maintains fire hydrants in and about the village, the mill, various buildings in the yard area, and at various other locations.

There is a cemetery, located on plaintiff's property, for its employees and their families.

Prior to the abolition of the perquisite system, employees of plaintiff performed the work of maintaining and keeping in proper repair the dwelling houses owned by plaintiff, and the village area, and in supplying the usual services necessary to the operations of a community. This has continued without change. Under the mentioned collective bargaining agreement, plaintiff expressly undertakes to provide dwelling maintenance and repairs, and village services; and in this connection, not "to make housing a profit-making venture, as such."

Organization of Plaintiff's Plantation.

At all times involved herein, plaintiff has been a member of the Hawaiian Sugar Planters' Association (HSPA), an organization of Hawaiian sugar-producing plantations. The association publishes a manual, portions of which were received in evidence as Defendants' Exhibit 2. Major enterprises of the association, as set forth in this manual, are quoted in a publication of the United States Department of Labor, entitled "The Economy of Hawaii in 1947", Bulletin No. 926, prepared and transmitted to the Congress of the United States pursuant to a requirement contained in the Organic Law of the Territory of Hawaii, 1900, as amended April 8, 1904, 33 Stat. 164, 29 U.S.C.A. § 7. A copy of the publication was received in evidence as Defendants' Exhibit 3B. An earlier report of the Department of Labor, also rendered pursuant to the provisions of the Organic Law of the Territory, was published under the title, "Labor in the Territory of Hawaii—1939", Bulletin No. 687, House Document 848, 76th Cong., 3rd Sess. A copy of this report was received in evidence as Defendants' Exhibit 3A.

As described in the manual issued by HSPA, its functions are these:

"The Hawaiian Sugar Planters' Association is an organization of plantations and individuals united for the purpose of cooperative improvement of the island sugar industry as a whole * * * The association's major enterprises are divided into the following departments: Experiment station, bureau of labor and statistics, labor saving devices committee, boiler inspection committee, public relations committee, labor relations committee, legislative committee.

"The association acts as a clearinghouse for all activities of the industry, making possible the freest and quickest interchange of information among the plantation executives. It maintains an office in Washington, D. C., which handles all relations of the Hawaiian sugar industry with Government departments and the Congress." (Def. Ex. 3B, pp. 34–35.)

This statement of the functions of HSPA is supplemented as follows: "The plantations are organized in an association which has planned for the Hawaiian sugar industries as a whole and which has developed the whole framework of economic relations necessary to their existence on an industry-wide basis, including shipping, the purchase of fertilizer, equipment and other supplies, the development of mainland refineries and markets, the supervision of management labor policies, the maintenance of research laboratories and the formulation of common programs of action for combating plant diseases, insect pests, and soil problems." (Def. Ex. 3B, p. 33.)

A further aspect of plaintiff's organization is found in its relationship to Castle & Cooke, Ltd., an agency or factor with which it is connected (Def. Ex. 2). Concerning the relationship that exists between plantation and factor, the HSPA manual declares as follows: "While each of the 36 plantations in the Hawaiian Islands is a corporate entity, all their affairs, except the actual operation of sugar growing, are centralized in what are known as factors, general agents offering a multitude of services to their clients. There are five principal factors: Alexander & Baldwin, Ltd., American Factors, Ltd., C. Brewer Co., Ltd., Castle & Cooke, Ltd., T. H. Davies & Co., Ltd." (Def. Ex. 3B, p. 35.)

The functions of the factors are summarized as follows in the HSPA manual:

"Financial.—All fiscal matters of the plantations are handled by specialists in the offices of the factors. Moneys are received and disbursed, tax statements prepared, water and land rents paid or received, surpluses invested, or deficits advanced.

"Experimental.—Engineers and other technicians are constantly seeking ways to improve the output of the various client plantations.

"Shipping.—All the multitudinous detail of shipping huge quantities of sugar by water to the mainland is in the hands of the factors.

"Merchandising.—Through their mainland buyers, the factors provide a steady flow of needed merchandise to plantation stores and to the plantations themselves.

Because of the size of their operation, everything a plantation and its personnel need is provided at a minimum cost." (Def. Ex. 2.)

The significance of the factor system is stated as follows: "The long-run result of the agency system was thus to deprive the plantations of their independence and to transfer control to the factors, a control which has been further unified by the coordination of policies and planning in the central offices of the Hawaiian Sugar Planters' Association." (Def. Ex. 3B, p. 35.)

These developments, as well as many other aspects of plaintiff's operations, would seem to be unique to the Territory of Hawaii.

"In the sugar-producing areas of Louisiana, Puerto Rico, and Philippines, and the sugar beet States, a farming system had been established before the development of the sugar industry. As the farmers in those areas already owned the land, sugar production grew along the lines of the established farming system.

"The Hawaiian sugar industry, on the contrary, began on land which was undeveloped. * * * The land tenure system in Hawaii is different from that in any other part of the United States. It is a complex outgrowth of the feudal system which existed before annexation, under native Hawaiian royalty." (Def. Ex. 3B, pp. 32–33.)

The typical Hawaiian sugar plantation has been described as a "small world in itself" (Def. Ex. 3A, p. 70), whose "structural organization and functioning * * is not unlike that of an army, with its clear cut lines of authority and its careful program for attaining given objectives" (Def. Ex. 3A, p. 14).

In immediate charge of plaintiff's plantation is its plantation manager, who is shown in a chart appearing under the designation "Plantation Organizations" in the published manual of HSPA (Def. Ex. 2), to have over-all control of all plaintiff's operations on the plantation, including conduct of plaintiff's villages. The designation of the

manager, and the authority exercised by him, have been described as follows:

"The manager of the plantation is appointed by the controlling 'factor' or agency. He has wide authority over the plantation and the mill and exercises a considerable influence over all community activities. * *

"The plantation manager was the chief official and central authority on all aspects of plantation life. In addition to his technical knowledge regarding sugar production, he had final responsibility in the direction and operation of sewerage and water systems, of the fire-protection systems, police force, the railroads, and performed many of the functions that a mayor would perform. He even sat as an informal judge on cases involving minor disturbances and petty larcenies." (Def. Ex. 3B, pp. 36, 39.)

### Departmentalization of Plaintiff's Operations.

Plaintiff maintains an elaborate system of keeping detailed records of all its costs and expenditures. All pumps, locomotives, trucks, tractors, machines and implements of machinery are given identification numbers, and a record is made of the hours of work performed in their maintenance, repair, and utilization. For each employee a daily timesheet is kept showing in detail what his work consisted of, and to which operation or piece of equipment it pertained. This information is transferred to a weekly time record, which also carries data concerning the employee's rates of pay for the jobs performed by him and his total compensation for the week. By use of a further series of numbers, plaintiff records whether a given piece of work represents a capital improvement or a running expense charge.

It appears from the testimony of plaintiff's office manager (Tr. 43–53) that its practice for nearly 20 years has been to keep separately identifiable sets of employee records for its several departments. The main departments were described by him as follows:

1. Service Department, which includes the railroad and truck operations, and the various shops: " * * * such as the track

shop (section repair shop), the P & H shop (caneloading machine repair), the welding shop, machine shop, paint shop, electric shop * * *."

2. Factory Department, which covers employees of the mill, commencing with "the employee who, when the cane car comes alongside the mill, weighs it and participates in the job of releasing the cane from the car into the container, the conveyor," and ends with the loading of sugar into freight cars or the warehouse adjacent to the mill.

3. Warehouse Department.

4. Field Department, which embraces "preparing for plowing, planting, ratooning, cultivating, irrigating, fertilizing, * * * up to the time that the cane was put on the main line of the plantation to take to the mill * * * in other words, where the permanent transportation line took over."

5. Village Facilities Department, covering painters, plumbers, carpenters, and others who repaired, maintained, and serviced plaintiff's villages, and the dwellings located therein and occupied by plaintiff's employees.

In addition to these main departments, there are a number of others, also separately maintained. These were identified as the office department, laboratory, civil engineering, hospital, truck department, and agricultural control and research.

The foregoing lengthy statement of the extent, nature, and methods of operation of this large agricultural industrial enterprise is culled from testimony and largely from a detailing written stipulation between the parties of 771 pages, to which is attached a printed contract between the company and ILWU Local 145, Unit 7, together with numerous maps, charts, and tabulations, all of which is a material part of this trial.

This corporate enterprise was organized over a half century ago and has shown continuing expansion and development. With the exception of a few years, it has been quite profitable to its agents and shareholders.

## Part II

### Commerce Coverage.

The activities of plaintiff described above constitute the operation of an industry which is engaged in commerce and in the production of goods for commerce. Included in these activities are a number of separate and distinct enterprises appropriate to the production of sugar and molasses under the many and unique circumstances out of which plaintiff's operations have developed and taken form. In the conduct of these enterprises, plaintiff has assumed a variety of functions including those of farmer, carrier, manufacturer, shipper, and operator of village communities. Plaintiff is, and the court finds it to be, subject to the provisions of the Fair Labor Standards Act.

Coverage under the Act for employees, so as to entitle them to the benefit of minimum wage protection, and payment of overtime for hours of work in excess of 40 per workweek, depends on whether they themselves are engaged in commerce, or in the production of goods for commerce, Sections 6(a) and 7(a) of the Act. Whether an employee is to be held covered as one engaged in the production of goods for commerce depends on whether he was employed either (a) in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods; or (b) in any process or occupation necessary to the production thereof, Section 3(j) of the Act. By Congressional amendment in 1949, the words "closely related" have been inserted in the aforementioned section before the word "process", and the words "directly essential" have been substituted for the word "necessary"; but this amendment was not made retroactive, and has no application to the issues of this case.

Plaintiff does not dispute that its employees, with the exception of a single group, are engaged in commerce or in the production of goods for commerce, within the meaning of the Act. The exception referred to relates to the work of certain employees who perform the work of re-

pairing and maintaining plaintiff's dwelling houses, and furnishing related community facilities and services to those who occupy such houses, these being in the main employees of plaintiff. As to such maintenance and repair employees, the contention of plaintiff is that, while so engaged, they are not in any process or occupation necessary to the production of goods for commerce. Determination of this aspect of the case is deferred to a subsequent place in these findings. It is appropriate to find at this point, and it is found by the court, that all activities of the defendants other than those concerning which the issue of coverage under Section 3(j) is raised, are and have been within the coverage of the law, such employees being either engaged in commerce or in the production of goods for commerce.

Recovery under the Act has two aspects. An employee is excluded if his activities are such that he is engaged neither in commerce, nor in producing goods for commerce (or engaged in an occupation necessary to production). On the other hand, an employee may be covered by the Act because he is engaged in the production of goods for commerce or in an occupation necessary to such production, but may not be entitled to the overtime protection of the Act because of the applicability of one or another of the exemption provisions. In this case, plaintiff relies on the following exemption provisions: Section 13(a)(6) (agricultural activity), Section 7(c) (sugar processing), Section 13(a)(2) (retail or service establishment) and, in one instance, Section 13(a)(1) (administrative or supervisorial activity).

The record shows that in numerous weeks various defendants worked for hours beyond 48, and in all such instances, hours of work beyond 48 were compensated at overtime rates; this includes employees engaged in agricultural activities. Overtime was also paid for hours in excess of 8 per day, for work on certain designated holidays, and when an employee was called to work on his scheduled day off. Since 1943, office and warehouse employees have received overtime for hours excess of 40

per week; and during the off-season, overtime has been paid for hours in excess of 40 per week to mill and shop employees.

The recovery of overtime pay sought in this action by defendants is limited to hours in excess of 40 per week, up to and including 48.

### Agricultural Activities.

■ Plaintiff contends that all of its employees are employed in agriculture, as the term "agriculture" is defined in the Act, and are therefore exempt from the entire operations of the Act, pursuant to Section 13(a)(6) thereof. The definition of "agriculture" contained in Section 3(f) is sufficiently broad to cover every operation of preparing the soil, cultivation, growing of the sugar cane, harvesting, and any practice performed by a farmer or on a farm either as an incident to or in conjunction with such farming operations, including preparation and delivery to market where this is done by farmers. An employee is therefore exempt from the protection of the Act by virtue of Section 13(a)(6) if, but only if, his work falls within the specific language of Section 3(f). Such, too, has been the interpretation expressed by the Administrator of the Act (Interpretative Bulletin No. 14).

■ Under this definition, activities exempt from application of the Act with reference to the growing of sugar cane at plaintiff's plantation, include the preparation of suitable seedbed in the cane fields; planting; ratooning; cultivating; spraying of fields with insecticides and herbicides; elimination of competing weed growth; clearing of stones; spreading of irrigation water and operation of irrigation controls; laying, moving, or removal of field irrigation flume; patroling of irrigation ditch lines; cleaning and weeding of irrigation reservoirs, drainage ditches and tunnels; fertilizing and other activities to improve the physical condition of the soil; fire protection; activities designed to guarantee or improve the growth of the crop; grading of cane fields; filling of holes, gulches and ditches in

fields; and harvesting operations performed to remove the crop from its growing position in the fields. These constitute farming operations, together with those activities of an incidental and conjoint nature, such as the picking up and reloading of cane stalks which have fallen from cars, the laying and shifting of sectional tracks in the fields, and the loading and moving of cane cars placed upon movable tracks and assembling the harvested crop at centralized points on the main line railroad, to commence transportation to the mill. Employees engaged in such operations, or in activities incidental to or in conjunction with them, are eliminated from the protection of the Act while engaged in such practices.

In accordance with these findings, the work of defendants which falls into one or another of the categories specified above, is exempt from operation of the Act, up to and including the point at which the crop is harvested. That point, which terminates the agricultural aspect of plaintiff's operations, occurs with the concentration of cars loaded with cane, upon the main line railroad operated by plaintiff, for transport, through intermediate processing, to the sugar refinery.

### Transportation.

Plaintiff contends that the operation of its main line railroad, and the work performed by its locomotive engineers, firemen, brakemen, and other employees connected with its railroad transportation system, are exempt both under the agricultural exemption of Section 13(a)(6) and the sugar processing exemption of Section 7(c). The latter section exempts employees engaged in the processing of sugar cane into sugar (but not refined sugar), but only when they are employed in a place of employment where the employer is engaged in the act of processing cane. The Administrator has interpreted this section to exempt employees who directly engage in processing activities, or who perform operations so closely associated thereto that they cannot be segregated for practical purposes, and whose work is also controlled by the irregular movement of commodities to the establishment; provided that such work is performed in the place where the processing actually occurs (Interpretative Bulletin No. 14). Congressional debates show that the purpose of the section was to relieve processors of seasonal agricultural commodities from the hour provisions of the Act so as to enable them more easily to conduct their operations during the peak seasons (Interpretative Bulletin No. 14).

Neither Section 13(a)(6) nor 7(c) applies to the activities of plaintiff's railroad employees. The train crews are not engaged in any act of producing sugar cane, or in any act incidental to or conjoint with the production of sugar cane; nor in processing cane into sugar at the mill, where the processing occurs. It is immaterial that they are employed by the same company which employs the farmhands and processing crews, since the determination of coverage must turn on the work of the employee.

"The mere fact that in this case the owners of the farms are also the owners of the mill and the transportation facilities does not make transportation an incident to farming.

\* \* \* \* \* \*

"There seems no rational basis for saying that simply because the ownership of the mill and the farms is in the same hands that, therefore, those employees who are engaged in an activity which is separate and distinct from agriculture are exempt from the provisions of the Act." Calaf v. Gonzalez, 1 Cir., 127 F.2d 934, 937, 938.

In determining whether an employee is exempt from the Fair Labor Standards Act either under Section 7(c) or Section 13(a)(6), the sole criterion is the character of the work performed by the employee, as disclosed by the record Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Snyder Min. Co., D.C., 66 F.Supp. 725. Section 7(c) does not embrace activities which, though related and necessary to

mill operations, are not performed conjointly with processing at the establishment where processing takes place.

Railroad operation is a systematic business calling for the employment of skilled, experienced men, trained to quick, keen perception (not farm hands or mill hands) for handling locomotives and moving cars (not the goods in transit), and for the maintenance of roadbed, track and structures, and roundhouse care and servicing of locomotives—all specialized technical work. Railroading is not farming or processing, nor intended by the Act to be a part of either. Here, the transportation operations are very substantial, occurring over many miles of trackage, and hauling hundreds of thousands of tons each year; and the investment in the railroad system, amounting to nearly a million dollars, is quite considerable. It is notorious that in years past some sugar plantations in Hawaii hired a common carrier utility company, whether from economy or lack of capital, to install a railroad system, to perform the work of hauling cane from fields to mill yards.

If Congress had said that raw *sugar production* should be given an exemption from the operation of the Act, a different situation would be presented. That Congress saw fit not to do this, is in itself significant. The parts of the Act here dealt with exempt agricultural or farming activities on the one hand, and processing on the other. The exemptions are separate and different, one of them applying both to minimum wages and overtime hours, and the other applying only to overtime hours. The transportation system of plaintiff is such that it constitutes a separate activity, so distinct in its nature that it is not reached by either of the exemptions.

Evidence given by plaintiff's office manager establishes that the employees of the railroad system are not attached to the Field Department or the Factory (Mill) Department, but instead are carried on the payroll records of the Service Department. Plaintiff has not treated the railroad employees as within the exemption of Section 13(a)(6), for during off-season these employees have been paid overtime after 40 hours of work. Subsequent findings on the activities performed by the railroad employees disclose that they are not ordinary farm hands, and do not perform agricultural activities. The railroad system is operated as a year-round pursuit; the element of seasonality does not enter into sugar production in the Territory of Hawaii. "Continuity of employment in the production of Hawaiian sugar is comparable to employment in manufacturing operations that have minor seasonal fluctuations rather than to typical mainland agricultural operations. The equable climate of Hawaii makes possible the continuous growth of sugar and it is technically possible to carry on every type of operation every day in the year" (Def. Ex. 3B, p. 64).

The operation of the railroad, as disclosed by this record, is not a practice performed "in conjunction with" farming operations. The activities of the railroad crew, and of those employed in activities relating to maintenance, upkeep and operation of the main line railroad system, occur subsequently to and independently of the farming activities, albeit coordinated thereto. On its records of operating costs, plaintiff distinguishes between harvesting and main line transportation.

Nor is the operation of the main line railroad "incidental" to the farming activities. The Administrator of the Act regards transportation as more closely linked to processing operations. This has been his view since 1943 (Administrator's Release G–322). This view finds support in several decisions of the United States Court of Appeals for the First Circuit dealing with the Puerto Rico sugar industry, Bowie v. Gonzalez, 117 F.2d 11; Calaf v. Gonzalez, 127 F.2d 934; Vives v. Serralles, 145 F.2d 552. In those cases it is held that the transportation of cane is not incidental to farming and therefore not exempt under Section 13(a)(6). Calaf v. Gonzalez, supra, 127 F.2d at pages 936–937. In Vives v. Serralles, supra, the agricultural exemption was held to end at the point of concentration of harvested cane, and this point was fixed as of the time when cane loaded into cars was

moved from portable track onto the main line permanent tracks; at this point the dividing line was fixed between activities exempt under Section 13(a)(6), and activities not so exempt.

This seems a useful, logical and necessary point of cleavage. It is also in accord with plaintiff's long-established practice, in the maintenance of its records, of separating field activities from transportation at the point where cane cars are placed on the main line railroad.

The sole object of plaintiff's operation is the production of sugar and molasses; and as these are manufactured in its mill, it might well be argued that operation of the mill is the dominant element, and that the growing of the raw material, sugar cane, is the subordinate or incidental element. It serves no purpose to resolve such an argument, for it is clear that plaintiff engages in many separate enterprises which, taken together, constitute a hybrid type of business, see Phillips, Inc. v. Walling, 324 U.S. 490, at page 495, 65 S.Ct. 807, 89 L.Ed. 1095.

Hauling cane on the main line railroad is not a part of harvesting operations, since the gathering of the crop is completed on the fields on which it is grown prior to transportation; and such transportation constitutes neither a storing of such crops, nor transportation either to storage or market. Transportation, as plaintiff engages in it, is a necessary preliminary to the operation of plaintiff's processing business in its mill, where the cane undergoes a substantial change in order to create raw sugar, from which state it is later further transformed into refined sugar, the main product which is sold.

Portable track is laid on the fields where cane is grown; but the permanent main line transportation is not located on the farm in the same sense. True, it is located on the plantation property, but the word "plantation" refers simply to the geographical area of nearly ten thousand acres on which plaintiff conducts all its operations. Obviously cane is not grown on the right-of-way occupied by the fifty-six miles of permanent main line railroad track. Land is set aside exclusively for railroad purpose.

The point where the main line track is joined by the portable track is the point at which harvested cane is concentrated for transportation, and at this point the agricultural exemption activity ceases and the railroad operation commences.

The court finds that employees who are employed in or on the roadbed, track, structures, cars and locomotives of plaintiff's main line railroad system, including roundhouse and rolling stock, repair and building shops, and flagmen, watchmen and dispatchers, are not exempt from the overtime provisions of the Act.

## Mill.

Plaintiff contends that employees whose work is performed in the mill are exempt under both Sections 13(a)(6) and 7(c). Mill activities commence immediately after the produce has been delivered into plaintiff's storage yard and brought alongside unloading platforms. Processing begins with the weighing, unloading and cleaning of the cane, and continues through crushing, juice treatments, crystallizing, and the bagging of the product and its removal from bagging and sewing machines, and its deposit in an adjacent warehouse, bins, tanks, or directly into cars or trucks for shipment. With these several operations through the factory, the processing is begun and finished in the place where the processor is so engaged, that is to say, the entire operating plant devoted to processing usage; whether within the mill itself or in the open yard, and whether the work there performed is mechanical or manual.

Such activities are not exempt under Section 13(a)(6). The mill operations are so conducted as to assume the character of a distinct business enterprise of an industrial nature; hence the mere fact that the processor is also engaged in producing a farm crop, and is processing only commodities grown by him, does not bring all of his operations within the Act's definition of "agriculture". The processing of sugar cane is surely no less an industrial operation than the stemming and

fermenting of leaf tobacco; these activities were held to be non-agricultural because they changed the form and nature of the crop. McComb v. Puerto Rico Tobacco Marketing Cooperative Ass'n, D.C., 80 F. Supp. 953, affirmed 1 Cir., 181 F.2d 697.

The mill operation is not a subordinate part of farming; it constitutes a large operation that follows the pattern of the industry in the Territory of Hawaii. A separate work force is employed for the processing operation in the mill; it does no work in the fields; it is paid in accordance with a scale of hourly rates which are different and distinct from the system used, partly at contract rates and partly at hourly rates, to pay farm labor. On its payroll records, and in the keeping of its accounts for purposes of making income tax returns, plaintiff segregates mill employees from those engaged in field activities. During off-season, plaintiff pays overtime after 40 hours to employees of the mill, but not until after 48 hours to employees engaged in the farm work.

The Court of Appeals for this circuit has warned against enlarging the term "agricultural laborer" beyond the usual idea that it suggests. Enlargement beyond common usage would produce only confusion. The test laid down is whether the product has been subjected to industrial activity. Industrial activity commonly means the treatment or processing of raw products in factories, North Whittier Heights Citrus Ass'n v. NLRB, 9 Cir., 109 F.2d 76, certiorari denied 310 U.S. 632, 60 S.Ct. 1075, 84 L.Ed. 1402, rehearing denied 311 U.S. 724, 61 S.Ct. 54, 85 L.Ed. 472. This decision, although interpreting the agricultural exemption of a different act, has been widely followed in its basic reasoning, and has recently been reaffirmed in Miller v. Burger, 9 Cir., 161 F.2d 992.

The determination of this court is supported by the views recently expressed both by the Solicitor of Labor and the Administrator of the Wage-Hour Division (2 CCH 14,068–14,071). Since 1941, the Administrator has taken the position that the exemption for agricultural employees "does not apply to sugar mill employees, even if the only cane ground in such a mill

is cane grown by the sugar mill owner in his own fields" (Administrator's Release R–1568, published in 1942 ed. WH Manual, p. 408). It is also the current view of the Board which administers the National Labor Relations Act, which by Congressional direction contains the same definition of "agriculture" that is to be found in the Fair Labor Standards Act. In Re Imperial Garden Growers, 26 LRRM 1632; 91 NLRB No. 167. See also Vives, Bowie, and Calaf cases, supra.

■ It is clear, however, that the activities under discussion are covered by the sugar processing exemption. Accordingly, the work of employees which takes place in the mill, in connection with the operation of processing machinery and activities closely and intimately connected therewith, are exempt under Section 7(c).

■ Several activities, while occurring in the mill, are not exempt because they do not constitute a part of the processing operations. Activities performed on bagasse, a by-product which is used for fuel, are not exempt because such activities do not constitute the processing of cane to obtain sugar or syrup, nor is it processed to obtain bagasse. The exemption is limited to the processing of cane into sugar or into syrup. This finding coincides with the long-established view of the Administrator (Interpretative Bulletin No. 14).

■ Where an employee's activities are connected with generation of electricity, some of which is used in the mill, but also in many other operations, including the lighting of employees' houses, administrative offices, repair and service shops, and the sale of surplus amounts to a public utility company, the exemption does not apply because of the commingling of exempt with non-exempt activities in the same workweek. The matter of commingling is later discussed in greater detail in these findings.

### Weekend Shutdown.

At the earlier trial, the defendants contended and the court held, that the activities in and about the mill during weekend shutdown, which consist of cleaning and minor repairs, were not exempt under Section

7(c), for the reason that they occur at a time when no processing is taking place. In consequence, an employee who performed 40 hours of exempt work in connection with processing operations, and additional hours of work during the weekend shutdown, was held to be non-exempt for the entire week.

Upon additional evidence and a new record in this re-trial, and reconsideration of this issue, it would appear that the weekend activities in the mill should not be held to defeat the exemption provided by Section 7(c). While the shutdown period consists of 24 consecutive hours, processing operations are not completely suspended during that interval. The crystallization processes of sugar remaining in the machines continue. Key employees in the fireroom, boiler room, and power house remain engaged in their regular activities. Though it is impossible to circumscribe with exactness the period during which no processing of sugar, in the literal sense, takes place, it would seem that such period comes to but a few hours, less perhaps than a full working shift, and partaking partly of the end of one shift and partly of the early portion of the next.

■ Employees who engage in the weekend cleaning and repair activities, work solely within the mill, and upon the very processing machinery which they operate during the remainder of the week. These employees also do the same kind of work while the mill is in operation, as an incidental activity connected with processing. In such circumstances, and in light of the exemption which Congress intended should be enjoyed under Section 7(c), the non-processing activities in the mill during weekend shutdown would appear to be too incidental and subordinate a factor to defeat exemption.

Accordingly, the court finds upon this record that the activities performed during weekend shutdown in the mill are not such as to defeat exemption, if it is otherwise applicable.

Off-Season.

The annual shutdown of the mill during the so-called off-season is a period when there is a total cessation of processing operations. Machinery and equipment located in the mill are completely overhauled, major repairs are made, and new machinery is installed. Generally the mill is shut down for a period of between 3 and 5 months. According to the evidence, plaintiff's off-season lasted 5 months in 1941; 3½ months in 1942; 3½ months in 1943; 4 months in 1944; 3½ months in 1945. In 1946, it ran from December 22 to February 9, a period of 7 weeks; this was an unusually short off-season, and doubtless relates to the occurrence of a strike lasting from September 1 to November 19, 1946.

During the off-season, mill employees engage exclusively in major cleaning and repair work, in overall preparation for the subsequent reopening of the mill. Additional men are brought in from other departments to participate in the overhaul which occurs in and about the mill, its machinery and equipment. Field employees are brought into the repair and service shops, to supplement the regular crews, because of the increased load of work. These facts not only establish the substantial nature of the off-season operation in preserving and enhancing capital investment,[5] but also account for the maintenance by plaintiff of a stable labor supply throughout the year, during which the number of man-days of work performed does not vary, regardless of season.

Not a particle of sugar is processed in the off-season.

■ It is plain, and the court finds, that the work which takes place in the mill during off-season is not exempt under Section 7(c). This holding produces no inconsistency with the finding in regard to weekend shutdown, inasmuch as the two differ vastly in purpose, nature, scale, and duration.

It has long been the Administrator's view that the exemptions provided by Section 7

---

5. "In October 1947 the HSPA Plantation News stated: 'Estimates of the amount of money being spent in 1947 and 1948 for improvements and new equipment on sugar plantations run as high as $20,000,000 and actual outlays may be even higher.'" (Def. Ex. 3B, p. 40.)

(c) do not apply during any dead season or off-season, when processing activities are suspended entirely for a substantial and prolonged period of time (Administrator's Release R–1892; Jan. 25, 1943). This view has been uniformly upheld by the courts. Such was the ruling in the sugar industry in Puerto Rico in the case of Maisonnet v. Central Colosso, Inc., 2 WH Cas. 755; and the decision has been the same in reference to the cotton seed processing industry, Heburg v. Independent Oil Mill, Inc. 5 WH Repts. 777 (W.D.Tenn.); Abram v. San Joaquin Cotton Oil Co., D.C.S.D.Cal., 49 F. Supp. 393.

It is also worthy of note that plaintiff has paid, for a number of years, and throughout the period covered by this action, overtime for hours of work in excess of 40, to all mill hands, employees of the repair and service shops, and others who participate in the off-season work in and about the mill.

Repair and Service Shops.

Plaintiff claims that the employees of its repair shops are exempt both as agricultural employees and under the sugar processing exemption.

The agricultural exemption of Section 13(a)(6) is inapplicable. Machine shop men, welders, electricians, painters, carpenters, and others employed in the repair shop department, perform no work of an agricultural nature, or at a time or place conjoint with or incidental to the farming process, or on a "farm" in the sense in which that term is used in the statute. Plaintiff itself has always regarded these employees as a unit separate from the field employees. In the structure of plaintiff's business, agricultural workers comprise the Field Department; employees of the repair shops comprise the Service Department. Workers in these respective categories are carried on separate and distinct pay-rolls. For cost accounting and income tax return purposes, plaintiff makes the same distinction in its records between these departments. As subsequent findings show, plaintiff has never treated repair shop employees as falling under the agricultural exemption, inasmuch as, during off-season,

repair shop employees have been paid overtime for hours of work in excess of 40 per week; this, of course, is a payment not required to be made to employees engaged in agricultural work, whether it be off-season or grinding season.

Neither is Section 7(c) applicable to exempt these employees. Their work is not that of engaging in processing, or in any part of processing, nor is their work so integrated with processing as to be a portion thereof, incapable of segregation. Plaintiff has not treated the repair shop employees as part of its mill operations. Payrolls and cost accounting records for income tax purposes show the employees of repair shops separately from the mill hands. The activities of repair shop employees relate not alone to the mill, but to all aspects of plantation operations, including the field, village facilities, administration building, etc.

Repair shop employees are not occupationally attached to the mill. The headquarters out of which they work is in each instance a separate structure, in which they generally perform the major portion of their work, to which they regularly report each day, and in which they receive supervision and instructions. These structures are located at varying distances, up to 300 feet, from the mill. When occasion requires them to be elsewhere than in their shops, they perform services for every operation on the plantation, not the mill exclusively. Most of them do not generally perform work inside the mill building, except during off-season, when processing is suspended. They are under separate foremen and supervisors. There is no interchange shown, during the grinding season, of personnel, equipment, or materials between the mill and the repair shops.

It is plain that the repair shops constitute, and they are found to be, self-sufficient units, operated not as an incident to any other operation exclusively or dominantly, but rather as an integral part of the overall combination of separate enterprises jointly conducted by plaintiff. If the employees of an independent machine repair shop performed the repair activities under discussion, they would not be exempt from

the overtime provisions of the Act. The fact that such work was done by employees of plaintiff, under the circumstances here presented, affords no stronger basis for applying the exemption.

This determination coincides with the view expressed by the Administrator, both in his official releases (Interpretative Bulletin No. 14) and in the position asserted in a brief filed by him in this case with the Court of Appeals. Judicial authority treating of the same issue likewise supports this finding. In Walling v. Bridgeman-Russell Co., 2 WH Cas. 785, (District) Judge Bell held that the term "place of employment" as used in Section 7(c), means those portions of the establishment devoted by the employer to the actual processing operations, hence the exemption does not apply to employees who perform their duties at places not devoted to processing operations. He held the exemption inapplicable to electricians, carpenters, tinsmiths, firemen, engineers, garage employees who washed and greased trucks, watchmen, janitors, warehousemen, and laboratory technicians, although the degree of separateness and specialization in that case does not appear to approach the situation in the instant case.

In Walling v. DeSoto Creamery & Produce Co., D.C.Minn., 51 F.Supp. 938 at page 943, employees who worked at grading, packing and loading poultry, in a room adjacent to the one where slaughtering and dressing operations occurred, were held not employed in a place of employment where the exempt processing activity was performed; this was the holding despite the fact that the activities held non-exempt were performed on the processed product. In the case at bar, the employees under discussion do not handle cane, sugar, syrup, or molasses; their activities are confined to working on machinery, equipment, and structures.

The crucial point is that Section 7(c) does not exempt entire industries from the overtime provisions of the Act, but only the specific processes therein mentioned. Thus, while the activities of employees engaged in handling, slaughtering and dressing operations in a meat packing plant were held exempt, employees in other departments, such as those engaged in meat-curing and sausage-making, were held outside the scope of the exemption provided in Section 7(c). Fleming v. Swift & Co., D.C., 41 F.Supp. 825, affirmed 7 Cir., 131 F.2d 249. To the same effect, see Colbeck v. Dairyland Creamery Co., 70 S.D. 283, 17 N.W.2d 262. See also Shain v. Armour & Co., D.C., 50 F.Supp. 907; and McComb v. Del Valle, 80 F.Supp. 945.

### Mill Village Maintenance.

Plaintiff contends that its employees who perform repair and maintenance work on company dwellings occupied by plaintiff's employees, and who supply village services and facilities to the employees living in the plantation villages where these houses are located, are excluded from coverage under the Act upon the ground that they do not work in any process or occupation necessary to the production of goods for commerce. Alternatively, if this contention is overruled, plaintiff invokes the exemptions of Sections 13(a)(6) and 13(a)(2).

The question of coverage is plainly one that must be decided upon the facts peculiar to each case. The Administrator has expressly left the question of coverage open, evidently recognizing that decision might well vary with the given situation. No court decision has been found that passes squarely on facts similar to those here present.

Work of a repair and service nature has frequently been held covered by the Act as a type of activity necessary to the production of goods for commerce. A few decisions of this kind may be noted: Repair of boats used in interstate commerce Walling v. F. S. Lowe & Son Boatways, 5 WH Cas. 937; mechanical work for an independent machine corporation whose chief business consisted in servicing the tools and equipment of a company engaged in mining and shipping of coal in interstate commerce Princeton Mining Co. v. Veach, 5 WH Cas. 734; painting, repairing, and reconstructing trucks which were brought to the employer's plant and by customers who owned them, and which were used in the interstate transportation of goods, Walling v. Sturm & Sons, 6 WH

Cas. 131; maintenance men, mechanics, and mechanics' helpers who worked at garages on trucks leased by their employer to customers making substantial use of the trucks in interstate commerce, Skidmore v. Casale, Inc., 6 WH Cas. 33. Also to the point are Claudio v. Sobrinos De Portilla, Inc., 5 WH Cas. 484, holding the Act applicable to employees of a corporation operating a factory and machine shop, the greater part of whose business was the repair and servicing of industrial concerns producing sugar for commerce; and Agosto v. Rocafort, 5 WH Cas. 176, holding the Act applicable to a mechanic engaged in repairing and overhauling trucks operated by an employer in a trucking business used chiefly to transport cargo from concerns producing sugar, to be shipped in commerce.

Maintenance workers, watchmen, and similar employments have also been held covered. These employments were held covered in McComb v. Russell Co., 17 Lab. Cas. 76, 781; by the United States Court of Appeals for the Fourth Circuit in Slover v. Mathen, 140 F.2d 258; by the United States Court of Appeals for the Seventh Circuit in Engebretsen v. E. J. Albrecht Co., 150 F.2d 602; and by the Supreme Court in Walton v. Southern Package Corp., 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298, and in A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

These decisions are readily distinguishable from the situation at hand, in that the employees involved therein performed work or services in, upon or directly relating to the very buildings, equipment, or instrumentalities which were used in the production of goods for commerce. The case here presented is one step removed, in that the repair and maintenance work is performed in and upon, and the service is rendered for, the dwelling houses inhabited by plaintiff's production employees.

A series of cases, which have come to be known as the cookhouse or cafeteria cases, deal with an analogous situation. In Consolidated Timber Co. v. Womack, 132 F.2d 101, the United States Court of Appeals for this circuit held the Act applicable to a baker employed in one of two cookhouses operated by a corporation engaged in logging and lumbering. It was held that the cookhouse was a necessary part of the company's production of goods for commerce, operated not with the intent or purpose of showing a profit to the owners from the sale of food or service, but rather to render a necessary assistance to the company's business, which was that of producing logs in interstate commerce: "The cookhouse was not a separate or independent establishment; it was actually a *part* of the Company's facilities—a link in the chain—whereby it operated its business and a means whereby it accomplished the purpose of its existence. Neither cookhouse was in competition with any private restaurant for there is no evidence of an effort to secure the patronage of the general public; the service was sold at cost to those whom the cookhouse was intended to serve: the loggers. The principal activity of the cookhouse definitely was not to furnish service to the consuming public, as such, but was to serve the employees of the Company." 132 F.2d at page 107. The job of the cookhouse employee was held to assist the activities of the loggers by keeping their board close to their place of work, thus rendering it easier for the corporation to maintain a proper organization of its loggers, and forwarding their work by furnishing the food whereby the men were given the strength to pursue their labors.

Many cases are in accord with this decision. The United States Court of Appeals for the Eighth Circuit, in Hanson v. Lagerstrom, 133 F.2d 120, followed our circuit, holding the Act applicable to one who assisted in preparing and serving meals, and maintaining a kitchen operated to benefit employees of a concern engaged in handling pulpwood, which was then converted into products sold in interstate commerce. A federal district court in Indiana held the Act applicable to a night manager employed by the owner of a cafeteria located in a war plant, to serve employees working in the plant who manufactured war materials shipped in interstate commerce; the cafeteria, though independent-

ly owned, was held an integral part of the organization of the manufacturer, and a necessary part of the facilities used by the manufacturer, Ferguson v. Prophet Co., 6 WH Cas. 284. A federal district judge in Massachusetts similarly applied the Act to employees working in their employer's commissary, which was located in a railroad station and, served as a kitchen and storeroom for the employer's retail stands and train service department in the same station, and for the employer's retail stands in railroad stations in other cities, Walling v. Armstrong Co., D.C., 68 F.Supp. 870. Employees in a canteen and cafeteria operated, on premises of Republic Steel Corporation, by an independent restaurant concern were held covered in McComb v. Factory Stores Co., D.C., 81 F.Supp. 403; coverage of the Act was there decided in favor of cooks, assistants, counter girls, dishwashers, and porters. The Supreme Court of Michigan held the Act applicable to employees engaged in preparing food at plant cafeterias owned and operated by a large industrial corporation which sells food solely to plant workers during their lunch and rest periods, Basik v. General Motors Corp., 311 Mich., 705, 19 N.W.2d 142, 159 A.L.R. 966.

The foregoing decisions turn on the finding that the work performed by such service employees is itself a part of an over-all integrated effort for the production of goods for commerce. Supplying such services, and maintaining such supply, constitute activities covered by the Act, where they have a close and immediate tie with the process of production for commerce. Although each case depends on its own facts, the decisive elements are suggested by our Court of Appeals in Womack's case, supra, 132 F.2d at page 107: "Was not the greater number of diners at the cookhouses engaged in the production of goods for commerce? Were not the cookhouses an integral part of an organization devoted to the production of goods for commerce? Does it not follow, reasonably and logically, that the greater part of the services rendered by the cookhouses was in interstate commerce rather than intrastate?"

Three decisions reaching a contrary result are easily distinguishable, and are based upon reasoning which supports the principle of Womack. Kuhn v. Canteen Food Service, Inc., D.C., 77 F.Supp. 585, dealt with a restaurant operated, not by an employer engaged in the production of goods for commerce, but by an independent concern; and it was not operated as a part of facilities devoted to production of goods for commerce. Judge LaBuy accepts the principle laid down in Womack's case, saying, 77 F.Supp. at page 591: "The court is convinced that in cases where the production of goods is in an isolated spot where board cannot be readily obtained by employees, that [sic] it would be necessary for the company to furnish board to its employees, and in such cases the furnishing of the board would be a necessary part of the production of the goods."

Again, in Bayer v. Courtemanche, D.C., 76 F.Supp. 193, 196, a similar case was presented. Judge Smith there said:

" * * * there has been no showing that the time for lunch was too short for the production workers to eat outside, nor that restaurants were not available nearby, nor that the service in them was inadequate for the workers in the area, nor, indeed, that any great proportion of the production employees of the plant availed themselves of the cafeteria at meal times.

"Had any of these elements been shown by the plaintiff, it might be that his work could be considered necessary * * *."

Judge Yankwich also found against coverage in Tipton v. Bearl Sprott Co., D.C., 93 F.Supp. 496, where a restaurant, not operated by Columbia Steel Company but by an independent contractor, was maintained at most as a convenience for employees at Columbia Steel, at a location in a city where numerous other restaurants were immediately available to Columbia's production workers. In a well-reasoned opinion, the court reviews the cases and bases its decision upon the fact that the cafeteria was operated independently of the company producing goods for commerce, was not located in any isolated area, was not shown to be patronized by

any substantial number of the steel company's employees, and represented only a convenience to such employees rather than a necessity; furthermore, that the steel company did not control the hours, wages or conditions of work of the cafeteria employees, and such cafeteria was in no way a part of Columbia's effort to produce steel.

In the case at bar, existing conditions are such that it has been necessary for plaintiff to furnish housing and community services to its production employees. The plaintiff's villages are located both in isolation and insulation from the rest of the Territory; these villages are located upon plaintiff's lands, and are many miles from any city. No other housing in adequate quantity, except that provided by plaintiff, is shown to be available to plaintiff's employees. Historically, plaintiff constructed these houses and established these villages for the purpose of supplying necessary dwellings for a stable labor pool which plaintiff desired to be in close proximity to its operations.

Maintenance of village facilities and dwelling repairs were carried on by plaintiff as a part of its over-all production operations, not as a matter of mere convenience for its employees. Many of the employees of plaintiff who work on dwellings, and in connection with village facilities, are a part of plaintiff's production operations, being attached to various of the repair shops, such as the carpenter, plumbing and paint shops, which perform activities for the mill, in regard to production machinery and equipment, and for administration and office buildings. Housing and community services represented part of the wage payment made to plaintiff's employees in the form of perquisites. Abolition of the perquisite system in 1946 did not nullify either the original purpose of the housing, or the continued effectuation of that purpose. Indeed, plaintiff expressly undertook a contractual obligation with the union representing most of the defendants, to continue to furnish repairs and maintenance of housing, and village community services. At the same time, plaintiff expressed its intention not to make housing a profit-making venture as such.

More than 98% of plaintiff's employees inhabit its houses, and rental to outsiders is negligible; and among the latter are various individuals to whom plaintiff also rents space to operate commercial establishments needed in the villages. Doubtless the present availability of housing for rental to outsiders is related to the continuing mechanization of plaintiff's operations which naturally decreases the number of employees needed. The fact that the present relationship between plaintiff and its employees in regard to housing appears to be one of landlord-tenant, does not conceal the underlying realities. It is the duty of the court to look through the form to the substance. The 1946 conversion of housing and facilities into cash values, merely meant that these amounts were added to the employee's paycheck, but he paid back the same amount to the company as rental. Hence the form changed, but the substance remained unchanged.

Upon the foregoing facts, there can be no question that the operation and conduct of village facilities and housing are historically and presently an integral part of plaintiff's production effort. The only relevant court decisions passing upon repair work to homes occupied by employees of a concern engaged in interstate commerce, deal with city homes occupied by employees under genuine lease or sale arrangements. One such case is the decision of the federal district court for the Western District of South Carolina in Morris v. Beaumont Mfg. Co., 84 F.Supp. 909, 910. The Act was there held inapplicable to carpenters and painters engaged in the construction, maintenance and repair of residences rented by a textile manufacturing concern to its employees. The company owned an average of 280 dwellings, occupied by an average of 488 employees. The total average number of employees of the company was 1107. Occupancy of company-owned residences was optional with employees, and on the average more than half of them lived in homes owned by themselves or rented from

parties other than the employer. All the residences owned by the company were in the city of Spartanburg, located on city streets, and interspersed with other dwellings not owned by the employer. The company's manufacturing plant was enclosed by a substantial fence within which all of its manufacturing activities were carried on; none of the houses were contained within the fenced area. The key to Judge Timmerman's decision is seemingly his finding that "The defendant does not maintain a mill village in the sense that term is commonly used."

A similar decision is that of the District Court for the Western District of Virginia, in Coomer v. Durham, 93 F.Supp. 526, 529. The employer was a contractor who constructed and sold houses to the employees of a company engaged in the production of coal for interstate commerce. The coal company had at one of its operations 547 employees, of which number 412 lived in houses not owned by or rented from it, 75 lived in a village in houses purchased from the coal company, 42 lived in houses purchased by them in an entirely different village, and only 16 lived in company-owned houses. At all of its operations, the company had a total of 3251 employees, of which number 1334 lived in houses rented from it, 217 lived in houses purchased from the company, and 1700 lived in their own individual houses which had never been owned by the company. The villages in which the employees lived were not isolated communities; they were located on state highways linked with the federal highway system, and near to other communities. It was found that the coal company, from the start of construction, "planned to sell nearly all these houses and did sell virtually all of them just as soon as they were completed." Such sales, it was pointed out, were accomplished by a conveyance in fee simple by deed to the purchasers without restriction as to subsequent lease or resale; and subsequently to the original purchase, some of the purchasers had either rented or sold their houses to persons in no way connected with the coal company. Judge Barksdale found that it was not necessary, during the period of

time covered by the case before him, for the coal company to provide housing for its employees. The contractor's employees were therefore held not covered by the Act.

In Wilson v. Reconstruction Finance Corp., 5 Cir., 158 F.2d 564, 565, certiorari denied 331 U.S. 810, 67 S.Ct. 1199, 91 L.Ed. 1830, the Act was held inapplicable to employees acting as firemen at a housing project, and to others who supplied water service to the inhabitants thereof, the inhabitants being production employees of two corporations engaged in interstate commerce. However, the firemen and water plant operators were employees of an independent contractor not so engaged in interstate commerce. The court there said, "The independence of the employer of the plaintiffs and the employers of the housing occupants insulates the plaintiffs from the status of producers of goods for commerce."

The last three decisions, while holding against coverage, present a rationale which, when applied to the facts of the instant case, support a different conclusion. In origin and history, Waialua village was and remains a mill village, company-owned and company-controlled, in every sense of that term. The same is true of the smaller villages on plaintiff's plantation where its employees occupy company-owned dwellings. All these villages, and all of the buildings, houses, and other facilities existing therein, were created by plaintiff for the purpose of providing housing and community services for a stable supply of labor. These villages are located within the plantation area, and Waialua, the largest of them, was established in close proximity to the mill. Not only does plaintiff own the homes, but also the other services and buildings necessary to community life—the hospital, gymnasium, parks, playground, clubhouse. The opportunity to occupy or use any portion of these communities, their facilities and the dwelling houses therein, has always rested exclusively with plaintiff. Ingress and egress are subject to plaintiff's control.

While plaintiff's employees are not required under the collective bargaining agreement to live in company-owned hous-

es, there is no evidence that they have any real choice over the matter. The possibility of purchasing homes of their own seems to be a remote and rare occurrence; the unique system of semi-feudal land tenure plays a role. Only to an inconsequential extent is it possible for employees to rent, at suitable locations near to their places of work, houses owned by anyone other than plaintiff. It cannot be assumed to be accidental that, of 959 non-supervisory persons employed by the company, in the period to which this suit relates, only 16 lived in houses other than those owned by plaintiff.

The work done by plaintiff's employees in maintaining and keeping in proper condition the housing occupied by its production workers, is neither trivial nor insignificant to plaintiff's business of producing sugar. It represents a material contribution to plaintiff's production of sugar. Without the performance of such repair and maintenance work, plaintiff's housing and village facilities would fall into disrepair. Its employees would be unable to continue to occupy them, and there would be marked interference and damage to the continuation of production of goods for commerce. The close relationship between the maintenance of the mill villages and the production of cane and manufacture of sugar, is exemplified by the fact that mill village maintenance employees, such as carpenters, painters, and plumbers, perform their work indiscriminately both on the buildings and facilities used by plaintiff to conduct its production operations, and on the dwelling houses. Occupation by plaintiff's production employees of its housing is to be considered in connection with the fact that plaintiff hauls many of its employees from their homes in the mill villages to and from their job sites. In the operation of its business, plaintiff has departmentalized its activities; the plumbing shop and paint shop have personnel comprising intact groups who perform necessary work both on plaintiff's production buildings and its housing. In the case of carpenters, all are attached to the carpenter shop, without segregation between village

carpenters and industrial carpenters, except as to timekeeping.

It is in the light of these facts that decision must be made of the question presented. That question is whether the work of mill village repair and maintenance is "necessary" to the production of goods for commerce. Judge Healy has pointed out that the term "produced" is broadly defined in the Act. Culver v. Bell & Loffland, Inc., 9 Cir., 146 F.2d 29, 32. The Supreme Court has said that the word "necessary", as employed in the Fair Labor Standards Act, should not be applied in a manner that would give it an unwarranted rigidity; it is a word "to be harmonized with its context", Armour & Co. v. Wantock, 323 U.S. 126, 130–131, 65 S.Ct. 165, 167, 89 L. Ed. 118. The issue there decided was whether a firefighting service was sufficiently necessary to the operation of a soap factory, to entitle such service employees to coverage under the Act. The Supreme Court said:

" * * * no hard and fast rule may be transposed from one industry to another to say what is necessary in 'the production of goods.' What is practically necessary to it will depend on its environment and position * * *. What is required is a practical judgment as to whether the particular employer actually operates the work as part of an integrated effort for the production of goods.

\* \* \* \* \* \*

"A court would not readily assume that a corporation's management was spending stockholders' money on a mere hobby or an extravagance. The company does not prove or assert that this fire protection is so unrelated to its business of production that it does not for income-tax purposes deduct the wages of these employees from gross income as 'ordinary and necessary expenses.'"

(No claim is advanced by plaintiff that its expenditures for wages to its employees and for other purposes in the maintenance and repair of dwellings and village facilities, are not included in its income tax returns as part of its expenses of operation, 26 U.S.C.A.Int.Rev.Code, § 23(a)(1).

"More is necessary to a successful enterprise than that it be physically able to produce goods for commerce. It also aims to produce them at a price at which it can maintain its competitive place, and an occupation is not to be excluded from the Act merely because it contributes to economy or to continuity of production rather than to volume of production." Armour & Co. v. Wantock, supra.

■ Accordingly, the work performed by carpenters, painters, plumbers, and others was covered, because they contributed to "The maintenance of a safe, habitable building", A. B. Kirschbaum v. Walling, 316 U.S. 517, 524, 62 S.Ct. 1116, 1120, 86 L.Ed 1638, which was, in turn necessary to house, maintain, and keep in desired proximity to plaintiff's operations, employees whose work involved them directly in the production of goods for commerce.

Whether, since the amendment in 1949 of Section 3(j), such employees are covered for future work, is not here presented. The sole question for determination deals with the period between November, 1946, and September, 1947, which antedates the recent amendments. Hence, decision here is confined to the Act as it read at the time of the activities over which the suit has been brought and no intimation is intended as to the effect, if any, of the 1949 amendments of Section 3(j), particularly since the factual picture may have undergone change since 1949.

■ It remains to determine whether the exemptions of Section 13(a)(6) or 7(c) are applicable. For the reasons heretofore given in respect of employees in the repair shops, neither exemption applies.

### Commingled Work.

There are numerous instances shown of the performance by a particular defendant, within a single workweek, of some activities which are exempt under either Section 7(c) or 13(a)(6), and other activities which are non-exempt. As a general rule, the engagement by defendants in non-exempt activities, in those workweeks where this is found to be the fact, was substantial; and even in those instances where such engagement was small in amount, it was regular and recurring.

As construed by the Supreme Court, the statute makes each workweek the standard to be considered in determining the applicability of overtime provisions. Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 579, 62 S.Ct. 1216, 86 L.Ed. 1682. It would be contrary to the Congressional intent to grant the exemption for a workweek in which the employee performed some activities which Congress intended to be non-exempt. The Administrator has long held the view that, where exempt and non-exempt activities are commingled in a single workweek, the entire week is non-exempt (Interpretative Bulletin No. 14.)

This view has been uniformly sustained in an imposing array of decisions. Fleming v. Swift & Co., D.C.N.D.Ill., 41 F.Supp. 825, affirmed 7 Cir., 131 F.2d 249; Walling v. DeSoto Creamery & Produce Co., D.C. Minn., 51 F.Supp. 938; Shain v. Armour & Co., D.C.W.D.Ky., 50 F.Supp. 907; Walling v. Peacock Corporation, D.C.E.D. Wis., 58 F.Supp. 880; Weeks v. Postal Tel., 1 WH Cas. 1177; McComb v. Puerto Rico Tobacco Marketing Cooperative Ass'n., D. C.P.R. 80 F.Supp. 953, affirmed 1 Cir., 181 F.2d 697; Anderson v. Manhattan Lighterage Corporation, 2 Cir., 148 F.2d 971, certiorari denied 326 U.S. 722, 66 S.Ct. 27, 90 L.Ed. 428; Jordan v. Stark Bros. Nurseries & Orchards Co., D.C.W.D.Ark., 45 F.Supp. 769; Walling v. Bridgeman-Russell Co., 2 WH Cas. 785 (D.C.Minn.); Wabash Radio Corp. v. Walling, 6 Cir., 162 F.2d 391; McComb v. Del Valle, D.C.P.R., 80 F.Supp. 945; Sykes v. Lochmann, 156 Kan. 223, 132 P.2d 620; Gaskin v. Clell Coleman & Sons, 5 WH Repts. 581 (Ky.CC, Mercer Co., 1942); Loeb v. Ideal Packing Co., 7 WH Repts. 397 (Wisc.CC, Mill Co., 1944).

■ In the case at bar, there are a few scattered instances where a defendant was assigned to perform exempt activities for virtually the entire week, but also performed a non-exempt activity for a small portion of time, sometimes as little as an hour or less. It is in accord with judicial authority to stand on the plain meaning of the statute, and to hold the exemption in-

applicable, no matter how little time was devoted in the particular workweek to non-exempt work. Departure from the statute would create rather than obviate practical problems, including the problem of where and at what point to draw the line. The instances where such a small amount of non-exempt work was performed in a week which otherwise would be exempt, are few and scattered. They do not present a consistent or recurring pattern, and it is not claimed by plaintiff that it cannot easily avoid such situations by assigning the non-exempt activity to some other worker who normally performs that type of work as a regular part of his duties.

Accordingly, where in any given workweek a defendant engaged in activities some of which were non-exempt, none of the exemptions pleaded by plaintiff applies to such workweeks despite the fact that nearly all activities performed therein were exempt

### Retail Exemption.

Plaintiff urges that Section 13(a) (2) is applicable to some of its employees. This section exempts any employee engaged in a retail or service establishment the greater part of whose selling or servicing is in intrastate commerce. Upon the record of this case, it does not appear that any of the defendants fall within that provision; hence it is found that Section 13(a) (2) was inapplicable to all of the defendants.

### Liquidated Damages.

In subsequent findings, determination is made that certain of the defendants are entitled to recover stated amounts as overtime compensation due and owing to them. Defendants seek liquidated damages in amounts equal to the unpaid overtime compensation found due to them.

The Act provides that any employer found liable for unpaid overtime wages, shall also be liable "in an additional equal amount as liquidated damages" Section 16(b). In 1947, Congress passed the Portal-to-Portal Act, which contains provisions under which liability for liquidated damages, as well as unpaid overtime wages up to May 14, 1947, may be affected. Under Section 9 of that Act, no employer shall be subject to any liability, either for overtime wages or liquidated damages, if he pleads and proves that his failure to pay overtime was in good faith, in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation of any agency of the United States, or any administrative practice or enforcement policy of any such agency with respect to the class of employers to which he belonged; but this is expressly limited to claims based on an employer's failure to pay overtime prior to the date of enactment of the Portal-to-Portal Act, which was May 14, 1947.

Under Section 10, a second special defense is provided, which is more narrowly drawn with respect to the number or type of agencies of the United States on whose conduct an employer places reliance. Under this section, no employer subject to the Act shall be subject to liability for overtime compensation or liquidated damages, based on the employer's conduct on or after May 14, 1947, if he pleads and proves that his conduct was in good faith, in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, or any administative practice or enforcement policy of the Administrator of the Wage and Hour Division of the Department of Labor.

A final special defense is created by Section 11, which gives the court discretion to award no liquidated damages, or award any amount thereof not to exceed the amount specified in Section 16(b) of the Act, if the employer shows to the satisfaction of the court that his act or omission giving rise to the action was in good faith, and that he had reasonable grounds for believing that it did not constitute a violation of the Act.

 Plaintiff, by its pleadings, raised all three of these special defenses. However, these defenses were abandoned at the trial; no evidence was offered by plaintiff in support of these defenses, and nothing was "proved" or "shown to the satisfaction of the court" to support these pleas. In the absence of evidence to bring into operation any of the mentioned special defenses, there is no basis on which to deny full liquidated

234

damages to those defendants who are entitled to recover, inasmuch as such is the requirement of Section 16(b) of the Act.

Costs and Attorney's Fees.

The defendants pray for costs and attorney's fees. The Act provides that the court "shall, in addition to any judgment awarded * * * allow a reasonable attorney's fee to be paid * * * and costs of the action". Section 16(b).

 The amount of attorney's fee awarded should bear proper relationship to the facts of the case, and should be reasonable in light of the quantum of service rendered, the difficulties presented by the problem and issues involved, and the extent of recovery achieved.

The court will award an attorney's fee which takes into account the foregoing factors as they relate to the facts of this case, the occurrence of two trials and one appeal, and the total recovery for all defendants, which, including liquidated damages, amounts to $6,729.02.

Costs of suit will also be ordered paid to the defendants who prevail in this action.